Brett L. Foster (#6089)
Mark Miller (#9563)
Tamara L. Kapaloski (#13471)
**DORSEY & WHITNEY LLP**
111 South Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
foster.brett@dorsey.com
miller.mark@dorsey.com
kapaloski.tammy@dorsey.com

*Attorneys for Plaintiff Blendtec Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **BLENDTEC, INC., a Utah corporation,** | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| Plaintiff, | |
| vs. | Civil Case No. 2:25-cv-00096~-DBP |
| **BLENDJET INC.,** a Delaware corporation, **MAVORCO HOLDINGS, LLC,** a Delaware limited liability company, **MAVORCO IP, LLC,** a Delaware limited liability company, and **MAVORCO OPERATIONS, LLC,** a Delaware limited liability company, | Judge Dustin B. Pead **HEARING REQUESTED** |
| Defendants. | |

Pursuant to Fed. Rule Civ. P. 65 and 15 U.S.C. § 1116, Plaintiff Blendtec, Inc. ("Blendtec")

respectfully requests that the Court enter a Preliminary Injunction (a Proposed Order is attached)

enjoining Defendants Mavorco Holdings, LLC, Mavorco IP, LLC, and Mavorco Operations, LLC,

(collectively, "Mavorco") from infringing Blendtec's trademarks and enjoining Defendant

Blendjet Inc. ("Blendjet") from infringing Blendtec's trademarks on behalf of Mavorco.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................................... 1

II.  RELEVANT FACTUAL BACKGROUND ..................................................................... 2

   1.  Blendtec owns federal registrations for its BLENDTEC Mark and Swirl Design
      Mark .......................................................................................................................... 2

   2.  The Blendtec Marks are widely known by millions of consumers .......................... 3

   3.  Blendjet enters the blender market using infringing trademarks, forcing Blendtec
      to field hundreds of inquiries from confused customers ......................................... 4

   4.  Blendjet Issues a Massive Recall, Further Damaging Blendtec's Reputation ......... 5

   5.  Mavorco purchases Blendjet's assets, including the trademarks at issue ............... 6

III. ARGUMENT ................................................................................................................... 7

   1.  Blendtec Is Highly Likely To Succeed On The Merits ........................................... 7

      A.  Blendtec Possesses a Protectable Mark ........................................................ 7

      B.  The Use of the Blendjet Marks is Likely to Cause Confusion ..................... 8

          i.   The Marks are Substantially Similar ................................................... 8

              a)  Sight – the marks are visually similar ..................................... 9

              b)  Sound – The marks have similar pronunciation ...................... 10

              c)  Meaning – The marks convey a similar meaning ..................... 10

              d)  The evidence also supports a finding of similarity of marks ......... 11

          ii.  Mavorco Intended to Trade on Blendtec's Goodwill When It Adopted the
              Blendjet Marks .................................................................................... 11

          iii. A Mountain of Confusion Evidence Exists Here ................................ 13

              a)  Direct evidence of actual confusion ....................................... 13

              b)  Circumstantial Evidence of Actual Confusion ....................... 14

          iv.  The Parties market similar products through similar methods ............. 15

          v.   Consumers purchase Blendjet blenders on impulse .......................... 18

          vi.  Blendtec's Marks are Very Strong ..................................................... 18

   2.  Irreparable Harm Exists .......................................................................................... 19

      A.  Blendtec is Entitled to a Presumption of Irreparable Harm ........................ 20

      B.  Blendtec Will Suffer Reputational Harm and Lost Goodwill ...................... 20

   3.  The Balance of Hardships Favors Entry of a Preliminary Injunction ..................... 23

   4.  The Public Interest Favors Entry of a Preliminary Injunction ............................... 24

IV.  THIS COURT SHOULD ONLY REQUIRE NOMINAL SECURITY ............................... 25

V.   CONCLUSION ................................................................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfwear, Inc. v. Mast-Jagermeister*,
No. 2:12-cv-00936-TC-DBP, 2021 WL 364109 (D. Utah 2021) .............................................9

*Basis Int'l Ltd. v. Research in Motion Ltd.*,
827 F. Supp. 2d 1302 (D.N.M. 2011) ...................................................................................18

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
805 F.2d 920 (10th Cir. 1986) ...................................................................................9, 10, 12

*Bliss Collection, LLC v. Latham Co., LLC*,
82 F.4th 499 (6th Cir. 2023) .................................................................................................12

*CCA & B, LLC v. F+W Media Inc.*,
819 F. Supp. 2d 1310 (N.D. Ga. 2011) .................................................................................15

*Continental Oil v. Frontier Refining Co.*,
338 F.2d 780 (10th Cir. 1964) ..............................................................................................25

*Coquina Oil Corp. v. Transwestern Pipeline*,
825 F.2d 1461 (10th Cir. 1987) ............................................................................................25

*Delta Western Group, L.L.C. v. Ruth U. Fertel, Inc.*,
No. 2:00-cv-45-C, 2000 WL 33710852 (D. Utah Sept. 28, 2000) ...................................24, 25

*Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*,
434 F. Supp. 3d 1227 (D. Utah 2020)............................................................................. *passim*

*In re Gen. Motors*,
500 F.3d at 1229 ...................................................................................................................25

*Harris Research, Inc. v. Lydon*,
505 F. Supp. 1161 (D. Utah 2007).........................................................................................24

*Healthone of Denver v. UnitedHealth Group*,
872 F. Supp. 2d 1154 (D. Colo. 2012).........................................................................9, 16, 17

*Heartland Animal Clinic v. Heartland SPCA Animal Med. Clinic*,
861 F. Supp. 2d 1293 (D. Kan. 2012) *aff'd*, 503 Fed. App. 616 (10th Cir.
2012) .....................................................................................................................................13

*Hodgdon Powder Co. v. Alliant Techsystems, Inc.*,
  497 F. Supp. 2d 1221 (D. Kan. 2007) ..................................................................................10

*Hornady Mfg. Co. v. Doubletap, Inc.*,
  746 F.3d 995 (10th Cir. 2014) ..................................................................................... *passim*

*Icleen Entwicklungs v. Blueair AB*,
  2021 WL 6104397 (C.D. Cal. 2021)..................................................................................10

*ICON Health & Fitness, Inc. v. Med. Prods.*,
  No. 10-cv-207-DN, 2012 WL 3962737 (D. Utah Sept. 11, 2012) .........................................8

*Instructure, Inc. v. Canvas Techs., Inc.*,
  No. 2:21-cv-00454-DAK-CMR, 2022 WL 43829 (D. Utah Jan. 5, 2022) .................15, 20, 23

*John Allan Co. v. Craig Allen Co.*,
  540 F.3d 1133 (10th Cir. 2008) .........................................................................................12

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987) ...........................................................................................8

*King of the Mt. Sports, Inc. v. Chrysler Corp.*,
  185 F.3d 1084 (10th Cir. 1999) ...........................................................................................9

*Kingsford Prods. Co. v. Kingsfords, Inc.*,
  674 F. Supp. 1428 (D. Kan. 1987)..........................................................................15, 16, 17

*Kodiak Cakes LLC v. Cont'l Mills, Inc.*,
  358 F. Supp. 3d 1219 (D. Utah 2019)...............................................................................24

*LaFlame Enters. v. Doe*,
  2023 WL 6929406 (D. Colo. Oct. 19, 2023) .................................................................22, 24

*Purple Innovation v. Forshan Dirani Design Furniture*,
  2024 WL 1347356 (D. Utah Mar. 29, 2024) ......................................................................20

*Sally Beauty Co. v. Beautyco, Inc.*,
  304 F.3d 964 (10th Cir. 2002) ..........................................................................12, 15, 17, 19

*Team Tires Plus, Ltd. v. Tires Plus, Inc.*,
  394 F.3d 831 (10th Cir. 2005) ......................................................................................15, 16

*Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll.*,
  23 F.4th 1262 (10th Cir. 2022) ......................................................................................20, 22

*Tsunami Softgoods v. Tsunami Int'l.*,
    2001 WL 670926 (D. Utah Jan. 19, 2001)........................................................20, 21

*Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Res.*,
    527 F.3d 1045 (10th Cir. 2008) ...................................................................7

*Vital Pharms. v. Monster Energy Co.*,
    2020 WL 3314724 (S.D. Fla. 2020) ...........................................................22

*Water Pik*, *Inc. v. Med-Sys., Inc.*,
    726 F.3d 1136 (10th Cir. 2013) ...............................................................19, 20

*Western Diversified Services, Inc. v. Hyundai Motor Amercia, Inc.*,
    427 F.3d 1269 (10th Cir. 2005) ...............................................................12

**Statutes**

15 U.S.C. § 1115(a) .......................................................................................8

15 U.S.C. § 1115(b) ...................................................................................3, 8

15 U.S.C. § 1116(a) .....................................................................................20

**Other Authorities**

*Gilson on Trademarks* § 5.05.......................................................................16

https://bullboat.co.uk/blog/how-the-founder-of-blendjet-manages-his-days/ .............................18

## I.  <u>INTRODUCTION</u>

For decades, Blendtec has sold high quality blenders under the "Blendtec" trademark and a swirl design mark. Blendtec has invested tens of millions of dollars to build its reputation as one of the best blender companies in the world. Nearly twenty years after Blendtec began selling blenders under its Blendtec and swirl design trademarks, Blendjet started selling low-quality portable blenders under the "Blendjet" mark and a swirl design mark. Because Defendant's "Blendjet" mark and swirl design are so similar to Blendtec's marks, they have and will likely continue to create harmful confusion in the marketplace vis-à-vis Blendtec. Indeed, disappointed and angry Blendjet customers have contacted (mistakenly) Blendtec in droves, complaining about their Blendjet blenders and demanding refunds and replacements. One Blendjet customer complained about her "blendtecs" that got "really hot while charging and melted." Buchanan Decl. at ¶20(17).[1] Another Blendjet customer threatened Blendtec with contacting the Better Business Bureau of Utah and the Utah Division of Consumer Protection regarding his Blendjet blenders. *Id.* at ¶24(36). These are just a few examples, *out of hundreds*, of confused consumers who mistakenly believed that Blendtec makes the portable Blendjet blenders and contacted Blendtec about their faulty "Blendtec Blendjet," the "Blendjet from Blendtec," and Blendtec's "little blenders." *Id.* at ¶24(41-42). As one confused customer stated, she "always thought that [Blendjet] was part of Blendtec." *Id.* at 24(42). Another asked, "so that's not a blender that you guys make that's smaller? . . . . Is it still Tom Dickson's invention though?" *Id.* at ¶20(25). One consumer's complaint

---

[1] References to the "Buchanan Decl.", the "Kapaloski Decl.", and the "Franklyn Decl." are respectively to the Declarations of Brian Buchanan, Tamara Kapaloski, and David Franklyn submitted herewith. Unless otherwise noted, references to "Exh. __" are to the exhibits to the Buchanan Decl.

pinpointed the massive problem this confusion causes to Blendtec's reputation: Blendtec "just lost a sale (and good will)." *Id*. at ¶20(24).

Blendtec sued Blendjet for trademark infringement in November of 2021. Blendjet refused to rebrand, and Blendtec was left reeling under a mountain of confused and dissatisfied consumers as the parties vigorously litigated the case. Then, in December of 2023, Blendjet issued a massive recall of nearly five million of its blenders over laceration risks from broken blades and risk of overheating and fires. Since then, Blendtec has been forced to field nearly daily calls from confused customers calling Blendtec about their recalled Blendjet blenders. The recall proved catastrophic to Blendjet, and Blendtec believed that Blendjet would soon be out of business, putting an end to the infringement and the irreparable reputational harm that Blendjet's infringement was causing. Instead, unfortunately, a new competitor (Mavorco) formed and entered the market, obtained the Blendjet marks through an asset purchase agreement, and began infringing Blendtec's marks. Blendtec brings this Motion, because it cannot afford to weather any further harm to its goodwill and reputation due to the Blendjet infringement. The Court should, therefore, enjoin Mavorco's adoption and use of the Blendjet mark and related swirl design mark that have caused, and will continue to cause, so much consumer confusion and irreparable harm to Blendtec pending resolution of this action.

## II.    RELEVANT FACTUAL BACKGROUND

### 1.    Blendtec owns federal registrations for its BLENDTEC Mark and Swirl Design Mark

For decades, Blendtec has advertised and sold high-quality blenders and related accessories under the BLENDTEC® mark and Blendtec's swirl design mark reproduced below:

*See* https://www.blendtec.com/. The BLENDTEC mark and the swirl design mark are both federally registered on the principal register. *See id.* at ¶2; Exh. 1 (Reg. No. 2,431,060 (BLENDTEC)); Exh. 2 (Reg. No. 4,050,765 (SWIRL)). Collectively, Blendtec's trademarks are referred to as the "Blendtec Marks". Blendtec received a registration for its BLENDTEC Mark in February of 2001, and first used that mark in commerce in September of 1999. Exh. 1. Blendtec received a registration for its SWIRL Mark on November 1, 2011, and first used the mark in commerce in March of 2000. Exh. 2. Blendtec's right to use both the BLENDTEC and the SWIRL Mark are incontestable.[2]

### 2. The Blendtec Marks are widely known by millions of consumers

Blendtec has manufactured and sold a variety of consumer and professional grade blenders since its founding in 1975. Buchanan Decl. at ¶5. Blendtec offers a premium blender that has been among the top selling blenders in the United States for decades. *Id.* Blendtec operates a website at www.blendtec.com, where consumers can learn about and purchase Blendtec blenders. *Id.* ¶6. Blendtec also currently sells or has in the past sold blenders through retail stores such as Walmart, Target, Home Depot, and others. *Id.* at ¶13.

Continuously since 1999, Blendtec has used the Blendtec Marks to advertise and market its blenders, including on its website and elsewhere on the internet. *Id.* at ¶¶5-7. Blendtec uses its

---

[2] Under Section 33(b) of the Lanham Act, a registration where the right to use is incontestable is "conclusive evidence" of (1) the validity of the registered mark, (2) the registrant's ownership of the mark, (3) the registrant's exclusive right to use the mark in commerce on or in connection with the goods or services specified in the registration. The BLENDTEC Marks cover "electric food blenders for use in the field of food and drink preparation."15 U.S.C. § 1115(b).

marks to promote its products on social media, including on Facebook (171,000 followers), Instagram (95,000 followers), and through its 180+ videos published on YouTube. *Id*. at ¶7. Blendtec's Will-it-Blend YouTube series has been recognized as one of the most successful internet marketing campaigns in history. *Id*. at ¶¶8-9. Blendtec's advertising efforts (including the famous Will-it-Blend YouTube series featuring Blendtec founder Tom Dickson), media appearances (including The Tonight Show with Jay Leno, The View, The Today Show, and the Discovery Channel), and its commercial accomplishments have contributed to its reputation and goodwill, making Blendtec a well-known and recognized name in the field of blenders throughout the United States and globally. *Id*. at ¶10. Blendtec has invested many millions of dollars over the decades to achieve success and brand recognition. *Id*. at ¶11.

### 3. Blendjet enters the blender market using infringing trademarks, forcing Blendtec to field hundreds of inquiries from confused customers.

Although Blendtec did not learn of Blendjet until later, in or around early 2018, *decades after* Blendtec began using the Blendtec Marks in commerce, Blendjet began using the BLENDJET mark and a swirl design mark in connection with selling portable blenders. *Id*. at ¶12. At first, Blendjet sold direct-to-consumer only on the [www.blendjet.com](www.blendjet.com) website. *Id*. at ¶13. Blendjet eventually began selling its blenders through retail stores nationwide, including at Target, Walmart, Costco, and Home Depot. *Id*. In the fall of 2020, Blendjet started selling its "Blendjet 2" blender, which it marketed as directly competing with kitchen countertop blenders. *Id*. at ¶14.

Blendtec began receiving inquiries and calls from confused customers who believed that the Blendjet blender was put out by Blendtec or was the portable product being offered by Blendtec. *Id*. at ¶18. Blendtec has received hundreds, if not thousands, of inquiries and calls from confused Blendjet customers calling Blendtec about their Blendjet blender. *Id*. Most of the

confused Blendjet customers called Blendtec to receive a refund or a replacement for a defective Blendjet blender, or to otherwise complain about their faulty Blendjet blender. *Id*. at ¶19.

In November of 2021, Blendtec filed a lawsuit against Blendjet for trademark infringement. *Id*. at ¶16. Blendjet refused to rebrand, and the parties vigorously litigated the dispute. In July of 2022, Blendjet expanded its product line by introducing an "XL 32 Oz. Jar" and representing that "with a simple twist, turn your Blendjet into a full-sized blender for use anywhere from the Kitchen to the Pool. *Id*. at ¶15. The confused customer calls continued to pour into Blendtec, including many customers calling about overheating and melting blenders that the customers mistakenly believed were sold by Blendtec. *See, e.g., id*. at ¶20(1)-(25).

**4.    Blendjet Issues a Massive Recall, Further Damaging Blendtec's Reputation**.

In December of 2023, Blendjet issued a recall of nearly 5,000,000 Blendjet blenders after the Consumer Product Safety Commission found that the "recalled blenders can overheat or catch fire and the blender blades can break off, posing fire and laceration hazards to consumers." *Id*. at ¶¶22-23. Thereafter, Blendtec received scores of inquiries regarding the recall from consumers who mistakenly believed that the recalled blenders were Blendtec blenders. *Id*. at ¶24(26)-(60). During the year following the recall, Blendtec and Blendjet attempted to settle the 2021 Action. *Id*. at ¶26. Those efforts were unsuccessful, and it became clear that Blendjet was experiencing serious financial difficulties after the recall. *Id*. Blendjet's demands were unreasonable, and Blendjet essentially threatened Blendtec with Blendjet's approaching insolvency, intimating that Blendtec had no chance of any recovery and that it should get what it could and walk away. *Id*. at ¶27. Blendtec fully expected that Blendjet would imminently go out of business and the trademark infringement and resulting reputational harm caused thereby would finally come to an end. *Id*.

Unfortunately, that was not the case.

### 5. Mavorco purchases Blendjet's assets, including the trademarks at issue.

Instead of ending, in early 2025, Blendtec discovered that Blendjet's assets, including the Blendjet Marks, were being transferred to a private equity firm called Sandton Capital Partners ("Sandton"). *Id*. at ¶28. Blendtec immediately sent a letter to Sandton, providing notice of Blendtec's trademark infringement claims related to the Blendjet Marks, advising Sandton of the massive consumer confusion caused by the Blendjet Marks, objecting to any use of those marks by Sandton or any new entity, and inviting a discussion with the Blendtec executive team. *Id*. at ¶29; Kapaloski Decl. at ¶5. Although Sandton received the letter by or on January 12, 2025, it did not respond until February 10, 2025. Kapaloski Decl. at ¶¶6, 9.

In a January 30, 2025, call between counsel in the 2021 Action, Blendjet disclosed that Sandton had purchased a loan secured by Blendjet's assets and had later foreclosed on the assets and sold them to a new entity, including the trademarks at issue. Kapaloski Decl. at ¶7. Blendjet declined to disclose the name of the new entity. *Id*. Blendjet represented that it no longer had any assets and intended to dissolve, but the timing of dissolution was uncertain. *Id*. Blendjet represented that it was still operating the Blendjet website and selling blenders for and on behalf of the new unnamed entity, and that the proceeds would go to the new entity. *Id*.

On February 7, 2025, Blendtec discovered through a USPTO filing that the Blendjet Marks had been assigned to a newly formed entity called Mavorco Operations, LLC. *Id*. at ¶8. The filing disclosed that Mavorco and Blendjet executed the assignment on January 13, 2025, *after* Sandton had been provided with notice of Blendtec's infringement claims. *Id*.

Although Blendtec attempted to persuade Sandton, Blendjet, and Mavorco to rebrand and

put a stop to the trademark infringement, on February 10, 2025, Mavorco made its intentions crystal clear by plastering the Blendjet Marks all over Times Square and publishing pictures of it on social media, proclaiming that "this is just the beginning!" Buchanan Decl. at ¶33. Movarco had taken steps to materially increase the reach and exposure of the infringing Blendjet Marks, which, without doubt, will likely dramatically increase the confusion and harm to Blendtec. On February 11, 2025, Blendtec filed this lawsuit against Mavorco and Blendjet. *Id.* at ¶35.

## III.   <u>ARGUMENT</u>

"To obtain a preliminary injunction, the requesting party must demonstrate four well-established factors: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued will not adversely affect the public interest." *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1238 (D. Utah 2020). Blendtec can easily make this showing.

### 1.   **Blendtec Is Highly Likely To Succeed On The Merits**.

To succeed on its claim for trademark infringement, Blendtec must demonstrate that it is (1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark. *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Res.,* 527 F.3d 1045, 1049 (10th Cir. 2008). "Of these factors, the central inquiry is the likelihood of consumer confusion." *Id.*

#### A.   **Blendtec Possesses a Protectable Mark**

Blendtec is the owner of the Blendtec Mark and the Swirl Design Mark, which are registered on the Principal Register and are used in connection with Blendtec's goods and services.

Exhs. 1-2. The Lanham Act creates a statutory presumption of protectability for registered marks. *See ICON Health & Fitness, Inc. v. Med. Prods*., No. 10-cv-207-DN, 2012 WL 3962737, at *3 (D. Utah Sept. 11, 2012) (citing 15 U.S.C. § 1115(a)). Moreover, Blendtec's trademark registrations are incontestable, which is conclusive evidence of validity, ownership, and the exclusive right to use the mark in commerce. 15 U.S.C. § 1115(b). The first element is met.

### B.    The Use of the Blendjet Marks is Likely to Cause Confusion

"Actions for trademark infringement under the Lanham Act turn in significant part on whether the allegedly infringing mark will cause a likelihood of confusion." *Equitable*, 434 F. Supp. 3d at 1245. "In the Tenth Circuit likelihood of confusion is evaluated under six factors: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Id*. "Obviously, the best evidence of a likelihood of confusion in the marketplace is actual confusion." *Jordache Enters., Inc. v. Hogg Wyld, Ltd*., 828 F.2d 1482, 1487 (10th Cir. 1987). Each of these factors weighs in favor of finding a likelihood of confusion.

### i.    The Marks are Substantially Similar.

"The similarity of the marks is the first and most important factor" in the analysis. *Hornady Mfg. Co. v. Doubletap, Inc*., 746 F.3d 995, 1001 (10th Cir. 2014). "Similarity is gauged on three levels: sight, sound, and meaning." *Id*. "Similarities in the marks get more weight than the differences." *Id*. The court does not "engage in a 'side-by-side' comparison," but determines whether the mark is confusing when singly presented. *King of the Mt. Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1090 (10th Cir. 1999). *See also Healthone of Denver v. UnitedHealth*

*Group*, 872 F. Supp. 2d 1154, 1174 (D. Colo. 2012) ("the marks must be compared in the light of what occurs in the marketplace where the prospective purchaser does not ordinarily carry a sample of the mark)". "In comparing marks, we do not independently examine each syllable of the marks but consider the marks as a whole as they are encountered by consumers in the marketplace." *Hornady*, 746 F.3d at 1001. Courts, therefore, "compare the full marks, not just their components." *Id.* "[A] lower degree of similarity is required when the marks are placed on closely related goods." *Alfwear, Inc. v. Mast-Jagermeister*, No. 2:12-cv-00936-TC-DBP, 2021 WL 364109, at *3 (D. Utah 2021) ("If a consumer encounters two related goods within the same market, that consumer would likely be confused even if the marks were only slightly similar.").

    a)    <u>**Sight – the marks are visually similar**</u>



       Both word marks are eight letter, two syllable marks that have the same first syllable ("blend"). Both have a three letter second syllable that includes a short "e" as the middle letter. The marks are both in all lower-case letters and include a similar circular swirl. The only differences in the appearance of the marks are (i) two different letters ("j" and "c"), and (ii) slightly different font. The color of the marks also sometimes differs. As similarities are given more weight than differences, and the marks are evaluated when singly presented rather than side-by-side, the marks are visually similar. *See, e.g, Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986) ("BEER NUTS" and "BREW NUTS" are similar even though "brew" and "beer" are not identical because "they are both one syllable words having four letters three of which are the same, and they both begin with the same letter").

**b)**    <u>**Sound – The marks have similar pronunciation**</u>

"A mark's 'sound' refers to pronunciation." *Equitable*, 434 F. Supp. 3d 1227, 1246 (D. Utah 2020). Here, the parties' marks sound very similar: both marks have two syllables; the dominant portions of the marks, "blend," have identical pronunciation; and the ending syllable in each mark includes a short-e sound.

**c)**    <u>**Meaning – The marks convey a similar meaning**</u>

Similarity of meaning means the marks "convey the same idea or meaning." *Beer Nuts,* 805 F.2d at 926. Although each mark must be considered as a whole, "the dominant portion of the marks is given greater weight." *Equitable*, 434 F. Supp. 3d. at 1246. Here, Blendtec and Blendjet convey a similar meaning because the dominant portion of the marks (*i.e.*, "blend") has an identical meaning and conveys the image of blending in consumers' minds. *See, e.g., Beer Nuts,* 805 F.2d at 926 (finding BREW NUTS and BEER NUTS "necessarily conveys the same meaning"). Although the second syllable in the marks (*i.e.*, "tec" and "jet") are not identical, those portions of the mark cannot be viewed in isolation without the dominant "blend" portion of the marks. "[C]onsumers are unlikely to divine significant differences in the marks' meanings given that they employ the same dominant word." *Equitable*, 434 F. Supp. 3d at 1247. *See, e.g., Icleen Entwicklungs v. Blueair AB*, 2021 WL 6104397, at *7 (C.D. Cal. 2021) ("Because the [marks "HEALTHPRO" and "HEALTHPROTECT"] both involve the word 'health,' the marks connote items related to healthcare, which lends a similar meaning to both."); *Hodgdon Powder Co. v. Alliant Techsystems, Inc*., 497 F. Supp. 2d 1221, 1230 (D. Kan. 2007) ("Both parties use the term clay [CLAYS and CLAY DOT] to convey similar meanings—that the gunpowder can be used for clay target shooting"). Thus, the parties' marks are substantially similar in sight, sound, and

meaning.

      **d)**      <u>**The evidence also supports a finding of similarity of marks**</u>

Blendtec employees have expressed concern about the similarity of the marks. One Blendtec employee advised others at Blendtec that "[m]y wife just sent me an Instagram ad for a company named Blendjet. Logo is very similar to ours and the name sounds like Blendtec as well." Buchanan Decl. at ¶17; Exh. 6. Consumers have also noted the marks' close similarity. As one consumer advised Blendtec, "I was on pinterest today and saw a promoted pin for 'blendjet' that also has a logo just like yours." *Id.* at ¶17; Exh. 7. Another Blendtec customer advised Blendtec that "there's a portable blender company using a logo that looks very much like yours with a similar name." *Id.* at ¶17; Exh. 8. Another asked Blendtec if they had put out a "small portable product," stating that the Blendjet "logo looks similar to yours." *Id.* at ¶17; Exh. 9. Another customer advised Blendtec that "[t]here's a company from China kind of looks like they are ripping off on your name and your trademark. They are calling themselves blendjet." *Id.* at ¶17; Exh. 10. Another consumer sent an ad for a Blendjet blender to Blendtec and stated: "I've been seeing this thing lately. Is this from Blendtec or are they just spoofing in Blendtec's good name?" *Id.* at ¶18; Exh. 11. After being advised that Blendtec did not sell the Blendjet blender, a customer stated that "I am so taken in . . . because, the, on the package, it is the same symbol, you know, like the swirl." *Id.* at ¶24(42); Exh. 54. As the evidence shows, there is a high degree of similarity in the sight, sound, and meaning of the BLENDEC and BLENDJET Marks. This factor strongly favors Blendtec and entry of a preliminary injunction.

      **ii.**      **Mavorco Intended to Trade on Blendtec's Goodwill When It Adopted the Blendjet Marks**

"Evidence that the alleged infringer chose a mark with intent to copy, rather than randomly

11

or by accident, typically supports an inference of likelihood of confusion." *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1139 (10th Cir. 2008). "The focus is on whether the defendant sought to derive benefit from the reputation or goodwill of the plaintiff." *Id*. As the Tenth Circuit has stated:

> Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion. . . . One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him.

*Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002). "Direct evidence of intentional copying is not necessary to prove intent." *Bliss Collection, LLC v. Latham Co., LLC*, 82 F.4th 499, 513 (6th Cir. 2023) ("the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying"). "Intent to infringe can be shown by circumstantial evidence." *Id*.

Mavorco adopted the Blendjet Marks with full knowledge of the Blendtec Marks and the consumer confusion they caused. On January 9, 2025, Blendtec sent notice of its trademark rights and claims to Sandton, advised Sandton of the consumer confusion evidence, and that Blendtec's claims would carry over to any use of the Blendjet Marks by any other entity. Kapaloski Decl. at ¶5. Rather than respond to Blendtec's notice and invitation for a discussion, Sandton transferred the marks to a new entity. *Id*. at ¶8. In the Tenth Circuit, the "deliberate adoption of a similar mark may lead to an inference of an intent to pass off goods as those of another." *Beer Nuts,* 805 F.2d at 927. *See also Western Diversified Services, Inc. v. Hyundai Motor Amercia, Inc*. 427 F.3d 1269, 1277 (10th Cir. 2005) (where defendant knew "that it intended to sell that design on identical goods in the same channels of trade as that in which [the plaintiff's] mark moved" it is reasonable to infer

intent to deceive the public). Mavorco adopted and used the Blendjet Marks blatantly, intentionally, and with full and undisputed knowledge of Blendtec's claims and of the consumer confusion being caused by the Blendjet Marks. The inference of intent is inescapable. This factor favors Blendtec.

### iii.    A Mountain of Confusion Evidence Exists Here

"The best evidence of a likelihood of confusion is actual confusion in the marketplace." *Equitable*, 434 F. Supp. 3d at 1248. *See also Hornady*, 746 F.3d at 1004 (same). "[G]iven the proper factual setting, even just a few instances of actual confusion can provide very persuasive of how and why confusion can occur." *Heartland Animal Clinic v. Heartland SPCA Animal Med. Clinic*, 861 F. Supp. 2d 1293, 1304-05 (D. Kan. 2012) (plaintiff's call log, documenting dozens of instances of confusion, provided strong evidence of actual confusion), *aff'd*, 503 Fed. App. 616, 621-22 (10th Cir. 2012). "Actual confusion is often established through direct (anecdotal) evidence and survey evidence." *Equitable*, 434 F. Supp. 3d at 1248.

### a)    <u>Direct evidence of actual confusion</u>

Blendtec has hundreds of documents and audio recordings showing actual consumer confusion. Just a few examples, *out of hundreds*, are set forth below:

1.    On March 18, 2020, a Blendtec customer tried to return to Blendtec her "Blendjet and receive a refund" because she is "really disappointed by this product unfortunately the quality is quite low." Buchanan Decl. at ¶20(2).

2.    On August 21, 2020, a customer complained to Blendtec that "I recently bought a Blend-jet and it's not working even after charging overnight. What should I do?" *Id*. at ¶20(5).

3.    On February 19, 2021, a Blendjet customer complained to Blendtec that "I bought two Blendjet 2's. . . .   Presently, I'm disappointed.   Both Blendjets are not functioning." *Id*. at ¶20(9).

4.  On June 12, 2021, a Blendjet customer complained to Blendtec that "I purchased a Blendjet from QVC" and "liquid drained out of" it on the first use. *Id*. at ¶20(13).

5.  On February 16, 2022, a Blendjet customer complained to Blendtec that "We got our blendtecs for Christmas" and "one . . . was getting really hot while charging and melted." *Id*. at ¶20(17).

6.  On May 6, 2022, a Blendjet customer complained to Blendtec about a defective Blendjet blender. *Id*. at ¶20(19).

7.  On August 13, 2022, a Blendjet customer wrote to Blendtec Customer Support regarding a "Faulty Blendtec 2." *Id*. at ¶20(22). The customer stated that she had purchased the "blendtec 2" at Bed Bath and Beyond. *Id*. The customer stated that she had returned the blender to Bed Bath & Beyond for a refund.

8.  On September 20, 2022, a Blendjet customer complained to Blendtec about his faulty Blendjet 2. *Id*. at ¶20(23). The customer responded with "that's confusing," after Blendtec told the customer that he had called Blendtec instead of Blendjet. *Id*.

*See also id*. at ¶20(1)-(25) for many other examples. Blendjet has also received similar correspondence from consumers. Kapaloski Decl. at ¶3.

### b)    Circumstantial Evidence of Actual Confusion

Blendtec retained an expert witness, David Franklyn, to conduct a survey on the likelihood of confusion in the 2021 Action. Franklyn Decl. at ¶2. Mr. Franklyn's survey found a 26.9% confusion rate for retail stores and a 14.0% confusion rate online, for an overall rate of confusion of 20.5%. *Id*. at ¶4. Mr. Franklyn believes the overall confusion rate strongly supports a likelihood of confusion in this case. *Id*. at ¶4. *See, e.g., 1-800 Contacts, Inc. v. Lens.Com, Inc*., 722 F.3d 1229, 1248-49 (10th Cir. 2013) ("[S]urveys without obvious defects indicating confusion of seven percent to 15 percent of the sample have been held adequate, when supported by other evidence, to prove a likelihood of confusion."). Considering the evidence of consumer confusion here, this factor weighs heavily in favor of Blendtec.

### iv.    The Parties market similar products through similar methods

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion." *Sally Beauty*, 304 F.3d at 974. "This factor is analyzed by considering (1) the similarity of products, and (2) the similarity in how the products are marketed." *Instructure, Inc. v. Canvas Techs., Inc.*, No. 2:21-cv-00454-DAK-CMR, 2022 WL 43829, at *12 (D. Utah Jan. 5, 2022). "The issue is not whether the goods and services can be distinguished from each other in some aspect, but instead whether consumers would believe that one entity produced both." *Id.* (citation omitted). *See also Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833-34 (10th Cir. 2005) ("basic premise—that a trademark provides protection only when the defendant uses the mark on directly competing goods—is no longer good law"). "[F]ederal courts have long since expanded trademark rights to protect against the use of a mark on non-competing but 'related' goods – that is, any good related in the minds of consumers." *Id. See also CCA & B, LLC v. F+W Media Inc.*, 819 F. Supp. 2d 1310, 1327 (N.D. Ga. 2011) ("This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties.").

Here, it is beyond dispute that the parties both sell blenders. It is not material that Blendtec sells counter-top blenders and Blendjet sells portable blenders. The "question is not whether the purchasing public can readily distinguish the products at issue, but rather whether the products are the kind the public attributes to a single source." *Kingsford Prods. Co. v. Kingsfords, Inc.*, 674 F. Supp. 1428 (D. Kan. 1987). "[T]he rights of the owner of a registered trademark . . . extend to any goods related in the minds of the consumers in the sense that a single producer is likely to put out

15

both goods." *Id.*[3] Consumers are confused, and will continue to be confused, because they believe that Blendtec has put out a small portable blender under the Blendjet name. *See* Buchanan Decl. at ¶18; Exh. 8 (a Blendtec customer stated that "I thought [the Blendjet blender] was a new Blendtec product"); Exh. 9 (consumer asked if Blendtec had put out a "small portable product"); Exh. 12 (consumer asked Blendtec "if you are making a battery powered blender called a blendjet"); Exh. 11 (consumer asked if the Blendjet "was from Blendtec"). In January of 2024, Blendtec received the following call from a consumer:

| | |
|---|---|
| Tech: | Thank you for calling Blendtec. My name is Shari, how may I assist you. |
| Customer: | Hi Shari. Um, I saw an ad for your Blend, um the new smaller little blender, what's it, Blendjet? Is that what it's called? |
| Tech: | Uh, it's the wrong company. We are Blendtec, Blendjet is a separate company. |
| Customer: | Oh it is. So that's not a blender that you guys make that's smaller? |
| Tech: | We do not, no. |
| Customer: | Oh. |

Exh. 33. Consumers think the Blendjet is "a blender that [Blendtec] make[s] that's smaller." *Id.*

Even though there are some differences in the parties' blenders, as the evidence shows, the blenders are related in the minds of consumers. Trademark rights "protect against the use of a mark on non-competing but related goods—that is, any good related in the minds of consumers." *Team Tires*, 394 F.3d at 833-34. Thus, the parties' blenders are closely related. *See, e.g., Healthone*, 872 F. Supp. 2d 1154 (recognizing "a potential of confusion between health insurance and health care services"); *Kingsford*, 674 F. Supp. 1428 at 1430 (finding likelihood of confusion where

---

[3] *See also Gilson on Trademarks* § 5.05 ("The issue is not whether the goods or services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both.").

plaintiff sold barbecue products, including charcoal briquettes and wood chips, and defendant sold a barbeque sauce).[4]

Also relevant to this factor is whether the same retail outlets sell the parties' blenders. "The possibility of confusion is greatest when products reach the public by the same retail outlets." *Sally Beauty*, 304 F.3d at 975. "None of our cases, however, require that the allegedly infringing product be available on the same shelves as the plaintiff's product." *Id*. Blendtec and Blendjet blenders are or have been available to purchase at the same retail outlets. *See* Buchanan Decl. at ¶13. It is possible to have both a Blendjet blender and a Blendtec blender in a shopper's online shopping cart at the same time.

Finally, the "Tenth Circuit has . . . noted that the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *HealthOne*, 872 F. Supp. 2d at 1181 (citation omitted). "The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks." *Id*. The parties both market their products online, including through Google Ads, Facebook, Instagram, YouTube, and Twitter, among others. the same consumers see the parties' ads and are confused as to who is behind them. For example, on November 30, 2020, a Blendtec employee notified others at Blendtec that "my wife just sent me an Instagram ad for a company named Blendjet" with a logo that "is very similar to ours and the name sounds like Blendtec as well." Buchanan Decl. at ¶17. Another customer saw a Blendjet ad and "[a]t first, I thought it was a new Blendtec product and clicked on the ad to check it out."

---

[4] Blendjet publicly represents that its blenders have "all the benefits of a big blender on the go". Buchanan Decl. at ¶14. *Id*. at ¶15 ("with a simple twist, turn your Blendjet into a full-sized blender for use anywhere from the Kitchen to the Pool").

*Id*. at ¶18; Exh. 8. On November 28, 2022, a consumer wrote to Blendtec:

> "your current TV ads [*i.e.*, Blendjet's ad] show the Blendjet 2 16oz portable blender" and mentions "going to your website for a Cyber Monday major discount. I spent an hour on your site [*i.e.*, Blendtec's site] trying to find the Blendjet 2 . . . . to NO AVAIL." Blendtec3705.

Buchanan Decl. at ¶20(24); Exh. 35. This factor too weighs in favor of a likelihood of confusion.

### v.    Consumers purchase Blendjet blenders on impulse

"If consumers are likely to exercise a high degree of care in purchasing a certain product, the likelihood of confusion is reduced." Thus, "items purchased on impulse are more likely to be confused than expensive items." *Equitable*, 434 F. Supp. 3d at 1250. The Tenth Circuit does not take a "price-determinative approach." *Hornady*, 746 F.3d 1006. The focus is instead on "whether the item is one commonly purchased on impulse." *Id*. Here, Blendjet's CEO has stated, "people buy a Blendjet on impulse." https://bullboat.co.uk/blog/how-the-founder-of-blendjet-manages-his-days/. Blendjet's blenders sell for around $50. While the price of Blendtec's residential blenders ranges from $300 to $600, the low price of Blendjet's product likely means that the consumer will not exercise a great degree of care. In any event, where, as here, the marks are confusingly similar, even careful consumers are being misled.[5] This factor favors Blendtec.

### vi.    Blendtec's Marks are Very Strong

"Likelihood of confusion depends partly on the senior mark's strength, *i.e.*, its capacity to indicate source of the goods with which it is used." *Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d

---

[5] *See, e.g., Basis Int'l Ltd. v. Research in Motion Ltd*., 827 F. Supp. 2d 1302, 1309 (D.N.M. 2011) ("effect of purchaser care, while relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue in that confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.").

1136, 1151 (10th Cir. 2013). "The stronger the mark, the greater the likelihood that encroachment on the mark will produce confusion." *Sally Beauty*, 304 F.3d at 976. "Strength has two components: conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of recognition in the marketplace." *Hornady*, 746 F.3d at 1007.

Conceptual strength is measured on a spectrum of distinctiveness ranging along the following five categories (from least to most distinctive): (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Water Pik*, 726 F.3d at 1152. "Only suggestive, arbitrary, and fanciful marks are considered strong in and of themselves." *Hornady,* 746 F.3d at 1007. Here, Blendtec's mark is suggestive, and therefore conceptually strong. *See id*. ("suggestive terms require the buyer to use thought, imagination, or perception to connect the mark with the goods").

Commercial strength is the marketplace recognition value of the mark. In evaluating commercial strength, courts look at (1) length and manner of the mark's use, (2) the nature and extend of advertising of the mark, and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product. *See id.* at 1007. Here, too, Blendtec's marks is strong. Blendtec has been prominently and extensively using the Blendtec Marks for decades. Buchanan Decl. at ¶¶5-8. During that time, Blendtec has spent millions advertising its Marks, and has enjoyed many millions of dollars in sales. *Id*. at ¶11. Blendtec is one of the most well-known blender companies in the world and has had viral marketing campaigns. *Id*. at ¶8-10. This factor heavily favors Blendtec. As every factor favors Blendtec, Blendtec is highly likely to succeed on the merits.

### 2.    Irreparable Harm Exists

### A.    Blendtec is Entitled to a Presumption of Irreparable Harm

"The Trademark Modernization Act states that 'a plaintiff seeking any such injunction **shall be entitled to a rebuttable presumption of irreparable harm** . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for preliminary injunction or temporary restraining order.'" *Instructure, Inc*., 2022 WL 43829, at *14 (*citing* 15 U.S.C. § 1116(a)) (emphasis added). "As specified by the statute, this rebuttable presumption is triggered when a party demonstrates a likelihood of success on the merits." *Id. See also Purple Innovation v. Forshan Dirani Design Furniture*, 2024 WL 1347356, at *8 (D. Utah Mar. 29, 2024) ("a trademark plaintiff seeking a preliminary injunction is entitled to a presumption of irreparable harm . . . upon a finding of likelihood of success on the merits"). As shown above, Blendtec is likely to prevail on the merits. As such, it is entitled to a presumption of irreparable harm. *See, e.g., Instructure, Inc*., 2022 WL 43829, at *14 ("The Court has found it highly likely that Instructure will succeed on the merits of its trademark infringement claim, therefore Instructure is entitled to a presumption of irreparable harm.").

### B.    Blendtec Will Suffer Reputational Harm and Lost Goodwill

Apart from the presumption of harm that applies here, irreparable harm may also be established by showing "a significant risk of harm that couldn't be compensated after the fact." *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll*., 23 F.4th 1262, 1270-71 (10th Cir. 2022). "In trademark infringement cases, grounds for finding irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill." *Tsunami Softgoods v. Tsunami Int'l.*, 2001 WL 670926, at *5 (D. Utah Jan. 19, 2001). "If another person infringes a trademark, that person borrows the owner's reputation, whose quality no longer lies within the owner's control." *Id*.

"There is injury regardless of whether the unauthorized use to which the marks are put is a better use, the same use, or a worse use." *Id*. "[P]otential damage to reputation constitutes irreparable injury for the purposes of granting a preliminary injunction in a trademark case." *Id*.

Here, Blendtec is exposed to enormous reputational damage by virtue of the infringing Blendjet Marks. Buchanan Decl. at ¶¶25, 27, 36. Even before the recall, Blendtec documented hundreds of instances of actual consumer confusion relating to failed or defective Blendjet blenders that consumers tried to return to Blendtec. *Id*. at ¶20. These Blendjet buyers mistakenly believed their faulty products were Blendtec blenders. *Id*. The following are just a few examples:

- A Blendjet customer tried to return to Blendtec her "Blendjet and receive a refund" because she is "really disappointed by this product unfortunately the quality is quite low." *Id*. at ¶20(2).

- Another Blendjet customer advised Blendtec that she was "disappointed" because her "Blendjets are not functioning." *Id*. at ¶20(9).

- Another Blendjet customer complained to Blendtec that "we got our blendtecs for Christmas" and one "was getting really hot while charging and melted." *Id*. at ¶20(17).

- Yet another Blendjet customer complained to Blendtec that she had purchased a "faulty Blendtec 2" at Bed Bath & Beyond, where she had returned it for a refund. *Id*. at ¶20(22).[6]

The recall exponentially increased the irreparable harm Blendtec experienced. Consumers mistakenly believed that Blendtec's blenders "can overheat or catch fire, and blender blades can break off, posing fire and laceration hazards to consumers." *Id*. at ¶23. But those dire warnings related to Blendjet, and not Blendtec. Blendtec began to experience customer services calls on a regular, almost daily, basis asking Blendtec to resolve the Blendjet recall issues. *Id*. at ¶24. As one

---

[6] Blendtec does not sell a "Blendtec 2." The confused customer was referring to Blendjet's "Blendjet 2" blender.

example, an angry Blendjet customer threatened to report Blendtec to the Better Business Bureau of Utah and the Utah Division of Consumer Protection. *Id*. at ¶24(36). Another Blendjet customer inquired about the risk of fire related to the "two Blendtec's" subject to the recall. *Id*. at ¶24(37). Yet another Blendjet customer called about "the little Blendtec" that had been recalled. *Id*. at ¶24(46). As a final but telling example, after Blendtec tried to dispel the confusion of a Blendjet customer calling about the recall, the customer pushed back, adamantly stating that she had purchased a "Blendjet from Blendtec." *Id*. at ¶24(42). Upon finally accepting that she had not, in fact, purchased a "Blendjet from Blendtec," the customer explained that she had "always thought [Blendjet] was part of Blendtec." *Id*.

Blendtec worked for decades to establish a reputation as having the best blender on the market that could blend anything safely without catching fire or lacerating customers. As the adage goes, "it takes 20 years to build a reputation and five minutes to ruin it." Millions of blender purchasers now mistakenly associate Blendjet's defective and dangerous products with Blendtec. *Id*. at ¶25. This "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars," and constitutes irreparable harm. *Trial Laws*., 23 F.4th at 1272. *See also LaFlame Enters. v. Doe*, 2023 WL 6929406, at *4 (D. Colo. Oct. 19, 2023) (irreparable harm exists where plaintiff "will suffer a loss of goodwill due to the sales of the inferior quality merchandise").[7]

As a result of the recall, Blendtec expected that Blendjet would go out of business, bringing

---

[7] *See Vital Pharms. v. Monster Energy Co*., 2020 WL 3314724, at *9 (S.D. Fla. 2020) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another. . . . It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm.").

an end to the infringement. *Id*. at ¶27. At the last minute, however, a private equity group swooped in and purchased a loan secured by Blendjet's assets. *Id*. at ¶31-32. Then, with notice of the Blendtec trademark infringement lawsuit and the consumer confusion caused by the Blendjet Marks, Sandton transferred the assets, including the Blendjet Marks, to newly formed Mavorco. *Id*. Thus, instead of the infringement and harm coming to an end due to Blendjet's insolvency, Blendtec is now faced with a new, well-funded player in the market that has just begun to infringe the Blendtec Marks. This creates a new chapter of irreparable harm from a new competitor that clearly intends to expand the harmful infringement and must be enjoined. *Id*. at ¶36.

### 3.    The Balance of Hardships Favors Entry of a Preliminary Injunction

"When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Instructure,* 2022 WL 43829, at *15. This is because "[o]ne who adopts the mark of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Id.* "[W]hen the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement." *Id*. Thus, "courts afford little weight to self-inflicted harms when conducting the balancing inquiry." *Equitable*, 434 F. Supp. 3d at 1255.

When Mavorco acquired the Blendjet Marks, it knew that Blendtec already operated in a substantially similar space under substantially similar marks. Kapaloski Decl. at ¶5. Mavorco was aware of Blendtec's incontestable and well-established trademarks, Blendtec's infringement allegations, and the mountain of consumer confusion but elected to go forward with the Blendjet Marks anyway. Thus, Mavorco "assumed the risk" when it chose to purchase and use the Blendjet Marks. While granting a preliminary injunction would prohibit Mavorco from using the marks, at

least temporarily, this harm is minimal in comparison to Blendtec's harm. *See, e.g., LaFlame Enters. v. Doe*, 2023 WL 6929406, at *4 (a defendant "faces no hardship in refraining from willful trademark infringement").

Blendtec stands to suffer great harm by Mavorco's continued use of the Blendjet Marks. Buchanan Decl. at ¶36. Blendtec has marketed and sold blenders under the Blendtec Marks for decades – investing tens of millions of dollars in promoting its blenders under its marks. To allow Mavorco to trade off the goodwill and reputation that Blendtec has built would be a significant harm to Blendtec. Blendtec is not asking Mavorco to stop selling blenders. Blendtec only asks that Mavorco stop using the Blendjet Marks. For these reasons, the balance of harm favors Blendtec.

### 4.    The Public Interest Favors Entry of a Preliminary Injunction.

"[T]rademark infringement is inherently contrary to the public interest." *Equitable*, 434 F. Supp. 3d at 1255. *See also Harris Research, Inc. v. Lydon*, 505 F. Supp. 1161, 1169 (D. Utah 2007) ("Infringement and dilution of trademarks are inherently contrary to the public interest.") (granting preliminary injunction). "Public interest in fair competition dictates that Defendant should not be allowed to profit off the efforts of Plaintiff achieving commercial success." *Kodiak Cakes LLC v. Cont'l Mills, Inc.*, 358 F. Supp. 3d 1219, 1237 (D. Utah 2019) (granting preliminary injunction). "The public interest also disfavors allowing competition at the expense of consumer confusion." *Id. See also LaFlame Enters.*, 2023 WL 6929406, at *4 ("the public has an interest in avoiding the customer confusion that can result from trademark infringement"). "[P]rotecting the rights of the owner of a registered trademark is consistent with the public interest because trademarks foster competition and promote the maintenance of quality in business." *Delta Western Group, L.L.C. v. Ruth U. Fertel, Inc.*, No. 2:00-cv-45-C, 2000 WL 33710852, at *8 (D. Utah Sept. 28, 2000)

(granting preliminary injunction). "This factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding trademark protections." *Id*. Here, an injunction will eliminate the consumer confusion between the parties' respective marks and will uphold trademark protection. This factor favors enjoining the unlawful infringement.

## IV.    THIS COURT SHOULD ONLY REQUIRE NOMINAL SECURITY.

The Tenth Circuit has held that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction, if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted). In this case, strong evidence proves infringement. The Tenth Circuit in *Gen. Motors* informs the Court's analyses: "when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement." 500 F.3d at 1229. Here, Mavorco cannot claim harm because the case for infringement is clear, and Movarco chose to engage in the infringing conduct with full knowledge that doing so causes consumer confusion. No bond should be required. *See e.g.., Continental Oil v. Frontier Refining Co.*, 338 F.2d 780, 782-83 (10th Cir. 1964) (affirming preliminary injunction with no bond in the absence of proof showing a likelihood of harm if a bond is not issued).

## V.    CONCLUSION

For the foregoing reasons, Blendtec respectfully requests that the Court issue a preliminary injunction to enjoin Mavorco's and Blendjet's trademark infringement.

Dated this 27th day of March, 2025.

DORSEY & WHITNEY LLP

*/s/   Tammy Kapaloski*

Brett L. Foster (#6089)
Mark Miller (#9563)
Tamara L. Kapaloski (#13471)
**DORSEY & WHITNEY LLP**
111 South Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile:  (801) 933-7373
foster.brett@dorsey.com
miller.mark@dorsey.com
kapaloski.tammy@dorsey.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of March, 2025, a true and correct copy of the foregoing document was served on counsel of record via the Court's CM/ECF System which sent notice to the following counsel of record:

George B. Hofman, IV: ghofmann@cohnekinghorn.com
Kathryn Tunacik: ktunacik@ck.law

In addition, I hereby certify that on the 27th day of March, 2025, a true and correct copy of the foregoing document was served on Defendant Blendjet Inc., who is unrepresented in this action, via email to John Zheng, Chief Revenue Officer of Blendjet, at john@blendjet.com.

*/s/ Tamara L. Kapaloski*

1