George B. Hofmann, IV (10005)
Kathryn Tunacik (13363)
**Cohne Kinghorn, P.C.**
111 E Broadway 11th Fl
Salt Lake City, Ut 84111
Tel: (801) 363-4300
Fax: (801) 363-4378
Ghofmann@Cohnekinghorn.Com
Ktunacik@Ck.Law

Lucy Jewett Wheatley (*Pro Hac Vice*)
**McGuireWoods LLP**
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-4320
Fax: (804) 698-2130
Email:  lwheatley@mcguirewoods.com

Kyle S. Smith (*Pro Hac Vice*)
**McGuireWoods LLP**
501 Fayetteville St., Ste. 500
Raleigh, NC 27601
Tel: 919-835-5966
Fax: 919-755-6607
Email: ksmith@mcguirewoods.com

Jessica S. Maupin (*Pro Hac Vice*)
**McGuireWoods LLP**
2601 Olive Street, Suite 2100
Dallas, TX 75201
Tel: (214) 932.6400
Fax:  (214) 932.6499
Email: jmaupin@mcguirewoods.com

***Attorneys for Defendants
MavorCo Holdings, LLC; MavorCo IP,
LLC; and MavorCo Operations, LLC***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **BLENDTEC INC., a Utah Corporation**<br><br>*Plaintiff,*<br><br>v.<br><br>**BLENDJET INC., a Delaware corporation, MAVORCO HOLDINGS, LLC, a Delaware limited liability company, MAVORCO IP, LLC, a Delaware limited liability company, and MAVORCO OPERATIONS, LLC, Delaware limited liability company,**<br><br>*Defendants.* | **MAVORCO'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br><br>Civil No. 2:25-cv-00096-RJS-DBP<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

Defendants MavorCo Holding, LLC, MavorCo IP, LLC, and MavorCo Operations, LLC (collectively "MavorCo") hereby submit their Brief in Opposition to the Motion for a Preliminary Injunction filed by Plaintiff Blendtec Inc. ("Plaintiff" or "Blendtec"). For the reasons stated below, Blendtec's Motion for a Preliminary Injunction (the "Motion") (Dkt. 25) should be denied.

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.     Blendtec and BlendJet Both Entered a Crowded Field of BLEND-formative Trademarks and Swirl Designs ...................................................................................................................3

II.     A Long History of Delay and Tactical Litigation ........................................................6

III.     Blendtec's Reactive Lawsuit and Injunction Motion....................................................7

IV.     MavorCo's Sale of Existing Inventory .......................................................................7

ARGUMENT .......................................................................................................................9

I.     Blendtec's Years-Long Delay Belies Any Claim of Irreparable Harm and Precludes Injunctive Relief.................................................................................................................10

     A.     Blendtec Delayed Nearly Three Years Before Filing the 2021 Action ............................11

     B.     Blendtec Delayed Again Before Seeking an Injunction in the 2025 Action...................12

II.     Blendtec Cannot Establish a Likelihood of Success on the Merits................................13

     A.     Blendtec Is Unlikely to Establish That it Owns Valid, Protectable Marks.....................13

     B.     Confusion is Unlikely Given the Commercial Context and the Limited Scope of Blendtec's Alleged Trademark Rights ...............................................................................................15

         1.     Blendtec's Marks Are Weak................................................................................15

             i.     Conceptual Weakness: The Blendtec Marks Are At Best Descriptive ... 15

             ii.     Commercial Weakness: The Blendtec Marks Lack Distinctiveness in the Marketplace .................................................................................................17

         2.     The Marks Convey Distinct Commercial Impressions ........................................18

         3.     The Parties Offer Distinct Products to Distinct Purchasers ................................19

         4.     Blendtec's Consumers Exercise High Degree of Care ........................................19

         5.     MavorCo's Intent Does Not Support Likelihood of Confusion...........................20

         6.     Alleged Actual Confusion Evidence Is Insufficient ...........................................21

III.     The Balance of the Equities Favor MavorCo............................................................25

IV.     Public Interest Disfavors an Injunction.....................................................................26

CONCLUSION ...................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  2010 WL 5186393 (D. Utah Dec. 15, 2010) ............................................................ 23, 24

*Braun Inc. v. Dynamics Corp. of Am.*,
  975 F.2d 815 (Fed. Cir. 1992) ................................................................................. 13

*Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*,
  815 F.2d 500 (8th Cir. 1987) ................................................................................. 26

*Close to my Heart, Inc. v. Enthusiast Media LLC*,
  508 F. Supp. 2d 963 (D. Utah 2007) ...................................................................... 26

*Cunningham v. Laser Golf Corp.*,
  222 F.3d 943 (Fed. Cir. 2000) ............................................................................... 19

*Donchez v. Coors Brewing Co.*,
  392 F.3d 1211 (10th Cir. 2004) ............................................................................. 13

*EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*,
  2006 WL 892718 (D.N.J. Apr. 4, 2006) .................................................................. 22

*Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*,
  434 F. Supp. 3d 1227 (D. Utah 2020) .................................................................... 15

*First Sav. Bank, F.S.B. v. First Bank Sys.*,
  101 F.3d 645 (10th Cir. 1996) ............................................................................... 17

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) ................................................................. 10

*GOLO, LLC v. Goli Nutrition Inc.*,
  2020 WL 5203601 (D. Del. 2020)........................................................................... 22

*GTE Corp. v. Williams*,
  731 F.2d 676, 222 U.S.P.Q. 803 (10th Cir. 1984).................................................. 10

*Harley's Hope Found. v. Harley's Dream*,
  Civil Action No. 22-cv-0136-WJM-STV, 2022 U.S. Dist. LEXIS 71750 (D. Colo.
  Apr. 19, 2022) ..................................................................................................... 10, 11

*Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*,
  2006 WL 2092391 (D. Kan. 2006)........................................................................... 11

*Hornady Mfg. Co. v. Doubletap, Inc.*,
  746 F.3d 995 (10th Cir. 2014) ................................................................ 13, 15, 18, 20

*Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*,
   2016 WL 4770244 (D. Del. 2016) ................................................................................... 26

*Jacobs v. Journal Publ'g Co.*,
   No. 1:21-cv-00690-MV-SCY, 2022 U.S. Dist. LEXIS 124625 (D.N.M. July 14,
   2022) ............................................................................................................................... 12

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
   185 F.3d 1084 (10th Cir.1999) ..................................................................................... 23

*Life, Inc. v. Renew Life Formulas, Inc.*,
   2006 WL 62829 (D. Utah 2006) ................................................................................... 12

*Logic Tech. Dev. LLC v. Levy*,
   No. 17-04630, 2021 U.S. Dist. LEXIS 165203 (D.N.J. Aug. 31, 2021) .................. 11, 12

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ........................................................................................................ 9

*MID, Inc. v. Medic Alert Foundation United States, Inc.*,
   241 F. Supp. 3d 788 (S.D. Tex. 2017) .......................................................................... 11

*Moke Am. LLC v. Moke Int'l Ltd.*,
   126 F.4th 263 (4th Cir. 2025) ...................................................................................... 13

*Mrs. Fields Franchising, LLC v. MFGPC*,
   941 F.3d 1221 (10th Cir. 2019) ................................................................................... 25

*Nat'l Oilwell Varco, Ltd. P'ship v. Black Diamond Oilfield Rentals, LLC*,
   No. CIV-24-1258-D, 2025 U.S. Dist. LEXIS 65717 (W.D. Okla. Apr. 7, 2025) ............... 11

*Numen, LLC v. KC Float Spa, LLC*,
   No. 2:22-cv-02351-HLT, 2023 U.S. Dist. LEXIS 197916 (D. Kan. May 3, 2023) ............ 12

*Overstock.com, Inc. v. Nomorerack.com, Inc.*,
   No. 2:13-CV-1095, 2014 U.S. Dist. LEXIS 89620 (D. Utah June 30, 2014) ............... 16, 18, 21, 22

*Primedia Intertec Corp. v. Tech. Mktg. Corp.*,
   35 F. Supp. 2d 809 (D. Kan. 1998) .............................................................................. 10

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995) ...................................................................................................... 14

*Route App, Inc. v. Heuberger*,
   No. 2:22-CV-291-TS-JCB, 2022 U.S. Dist. LEXIS 133506 (D. Utah July 26, 2022) ........ 11, 26

*Sally Beauty Co. v. Beautyco, Inc.*,
   304 F.3d 964 (10th Cir. 2002) ..................................................................................... 16

*Scoa Indus. Inc. v. Kennedy & Cohen, Inc.*,
   188 U.S.P.Q. (BNA) ¶ 411 (T.T.A.B. Aug. 28, 1975) ...................................................... 5

*Sebo Am., LLC v. K&M Housewares & Appliances Inc.*,
    No. 1:20-cv-03683, 2021 U.S. Dist. LEXIS 71414 (D. Colo. Mar. 18, 2021) .................................. 10

*Simon Property Group, L.P. v. mySimon, Inc.*,
    104 F.Supp.2d 1033 (S.D. Ind. 2000) .................................................................................... 23

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
    868 F. Supp. 2d 415 (E.D. Pa. 2012) .................................................................................... 19

*Traffix Devices v. Mktg. Displays*,
    532 U.S. 23 (2001) .......................................................................................................... 14

*United States Pat. & Trademark Off. v. Booking.com B. V.*,
    591 U.S. 549 (2020) .................................................................................................. 19, 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................................ 9, 10

**Statutes**

15 U.S.C. § 1072 ................................................................................................................ 3

15 U.S.C. § 1125(a)(3) ..................................................................................................... 14

## INTRODUCTION

This case arises from a long-running commercial and legal dispute between Blendtec, Inc. and BlendJet, Inc.—one rooted less in genuine intellectual property concerns than in failed acquisition talks and ongoing market competition. The preliminary injunction motion filed by Blendtec in March 2025—years after initiating litigation in 2021 (the "2021 Action")—appears calculated more to pressure MavorCo into settlement than to prevent any actual irreparable harm. Indeed, Blendtec fails to meet any of the four required factors for injunctive relief under Rule 65.

First, and dispositive for an emergency motion, Blendtec cannot establish irreparable harm. The long-standing status quo is that Blendtec and BlendJet have coexisted in the marketplace under their respective brands. In fact, the challenged BlendJet trademarks have been registered on the Principal Register at the United States Patent and Trademark Office ("USPTO") since 2019. In its three years of litigating the 2021 Action, Blendtec has allowed the status quo to persist and never sought a preliminary injunction. Blendtec provides no credible evidence that it faces imminent or non-compensable injury from MavorCo's sales of remaining "BlendJet" inventory.

Nor does MavorCo's purchase of the BlendJet assets constitute an emergency that merits extraordinary relief. MavorCo lawfully acquired the BlendJet brand and related assets through a legitimate foreclosure process after BlendJet's default. It has neither engaged in any infringing conduct nor in any way expanded BlendJet's activities—rather it has paused most aspects of the business and pivoted to selling through inventory. Blendtec's allegations of consumer confusion are not only thin—they rely almost entirely on anecdotal, outdated incidents that predate MavorCo's involvement and have no probative value in assessing whether there is a change in circumstances that merits an emergency order.

Second, Blendtec cannot demonstrate a likelihood of success on the merits. The commonality between the trademarks at issue is the term "blend." However, "blend" is a generic

term for the function of a blender, and as a result, this term is liberally used both generically and as a branding component throughout the blender industry. As the USPTO already concluded when it granted BlendJet a trademark registration for BLENDJET, many BLEND-formative brand names can, and do, coexist in the marketplace without source confusion. Therefore, the scope of protection for any given BLEND-formative trademark is narrow. While both BlendJet and Blendtec, as owners of registered trademarks, have an exclusive right to use their particular brand names, this right does not extend to blocking other blender companies from using "blend."

Third, the balance of equities tilts strongly in MavorCo's favor. Precluding MavorCo from using the marks it lawfully acquired through a foreclosure sale—while permitting Blendtec to continue its aggressive enforcement campaign without timely pursuing injunctive relief—would inflict disproportionate and unjustified harm. Despite many years to assemble evidence of its alleged harm, Blendtec fails to put forward any evidence of harm that will ensue if the injunction motion is denied and the status quo is maintained.

Finally, denying the injunction aligns with the public interest, as it preserves the competitive status quo that has existed since 2018. Denying the injunction also supports the public interest in free competition, as no one blender company should be permitted to monopolize the generic term "blend." The Supreme Court has warned against allowing a single competitor to monopolize a generic term through infringement litigation, a concern that strongly supports denying an injunction here.

For these reasons, Blendtec's motion for a preliminary injunction should be denied.

## BACKGROUND

Plaintiff's motion is rife with misstatements and omissions that distort the history and purpose of MavorCo's acquisition of the BlendJet assets. Most notably, Plaintiff fails to mention that MavorCo owns federal trademark registrations for BLENDJET and the swirl design mark

("Swirl Design"), the very trademarks that Blendtec seeks to enjoin MavorCo from using. Contrary to Plaintiff's assertions, MavorCo has engaged in a routine asset purchase and has not engaged in any infringement, nor has it amplified or escalated the use of the BLENDJET trademark or Swirl Design. MavorCo, at most, has facilitated the sale of existing BLENDJET-inventory, sales that have been ongoing since 2018.

## I.    Blendtec and BlendJet Both Entered a Crowded Field of BLEND-formative Trademarks and Swirl Designs

When it purchased the BlendJet assets, MavorCo also purchased BlendJet's longstanding registered trademarks for BLENDJET and the Swirl Design, registrations that offer statutory notice of MavorCo's (and previously, BlendJet's) exclusive right to use those trademarks in commerce. 15 U.S.C. § 1072. These registrations do not conflict with Blendtec's trademark registrations—for obvious reasons, many blender companies use the word "blend" as part of their branding. In fact, one of the first blenders was marketed under the brand name BLENDOR in 1939, and BLENDOR was registered as a trademark from 1954 to 2004. Maupin Decl., Ex. 3.[1]

Therefore when Blendtec filed to register BLENDTEC as a trademark in 1999, it clearly could not claim exclusive rights in "blend" because its direct competitors in the blender market had active trademark registrations incorporating the same terms, including for example, BLENDOR, BLENDER PLUS +, ULTRA BLEND, AERO-BLEND, BLENDER QUEEN, P-K BLEND MASTER, TOUCH BLEND, ITTY BITTY BLENDER, ACCU-BLEND, BLEND-IN-CAN, BLENDMASTER, ASTRO BLENDER, BLENDING STATION, STARBLEND 2000, SMART BLENDER, SENORITA BLENDER, TURBOBLEND, and BLENDFAST. Exs. 3–21.

---

[1] The declaration of Jessica Maupin ("Maupin Decl.") is attached hereto as **Exhibit A**. All following references to exhibit numbers refer to the exhibits attached to the Maupin Decl.

Similarly, when BlendJet entered the blender market in early 2018 using the BLENDJET mark and Swirl Design, it encountered an even more crowded field of BLEND-formative marks, including but not limited to MASS/BLEND, BLEND-N-GO, BULLET BLENDER, PRECISION BLEND SYSTEM, WILLITBLEND?, TOTAL BLENDER, BLENZER, MY BLEND, MAGNABLEND, BABY BLENDY, BLENDER DUO, BLENDERMATE, BLENDPLUS, BABY BLENDY, BLENDIN, SMART BLEND, BLENDID, FLO-BLEND, and THE BLEND FRIEND. Exs. 22–41; *see also* Answer (D.I. 44) at 16–28. Recognizing that the USPTO had already determined that no single blender company owned exclusive rights in the term "blend," BlendJet applied for the BLENDJET trademark in connection with blenders in early 2018. Pamplin Decl., ¶8, attached hereto as ***Exhibit B***. The examining attorney considered the other BLEND-formative trademarks on the Principal Register (including BLENDTEC) and found that BLENDJET did not create a likelihood of confusion with any other registered trademark. Exs. 96–97. Despite having the opportunity to do so, Blendtec did not oppose issuance of a trademark registration for BLENDJET, and one was issued in 2019. Maupin Decl. ¶101. Since that time, additional companies have registered or have pending applications for BLEND-formative trademarks for blenders, including BLENSET, BLEND GENIX, EASY BLEND, BLENDAR, BLENDMAX, BLENDBLACK, POLAR BLEND, BLENDSENSE, MULTIBLEND, HYDRATION BLEND, BLENDERX, THE ORIGINAL PORTABLE BLENDER, BLEND SIP CHILL, NEXT-GEN BLENDER, XBLENDZ, ECOBLEND, BLENDERMASTER, CLEANBLEND, NUTRIBLEND, BLENDERCOZY, BLENDZALL, BLENDERCAP, BLENDER BIT, BLENDQUIK, B BLENDNOW, BLENDTIDE, BLENDER PITCHER, SPLENDOR BLENDER, VITAMIN BLENDER, BLENDCRAFT, PARTY BLENDER, BLENTIX, and BLEND BLASTER. *See* Exs. 42–79; *see also* D.I. 44 at 16–28.

Unsurprisingly, the use of a swirl (a simple geometric shape) to symbolize blending or mixing is also an extremely common motif in the blender industry. Numerous companies other than BlendJet or Blendtec have registered swirl logos to indicate the blending function of blenders, including but not limited to:



Transform Senior Brands LLC,

Reg. No. 6,923,915



YIP, LLC

Reg. No. 4,406,665



Vita-Mix Management Corp.

Reg. No. 3,901,615



Enegi Brands Inc.

Reg. No. 6,126,527



Capbran Holdings, LLC

Reg. No. 6,189,207



Transform Senior Brands

LLC, Reg. No. 5,620,499

Exs. 80–95; *see also* D.I. at 29-31. When BlendJet registered the Swirl Design, as with the BLENDJET trademark, the examining attorney searched for confusingly similar trademarks in the blender field, and with full access to Blendtec's previously registered swirl,[2] concluded that BlendJet's Swirl Design did not create a likelihood of confusion with any registered trademarks. *See* Exs. 98–99. Blendtec also did not oppose registration of BlendJet's Swirl Design. Maupin

---

[2] *See Scoa Indus. Inc. v. Kennedy & Cohen, Inc.*, 188 U.S.P.Q. (BNA) ¶ 411 (T.T.A.B. Aug. 28, 1975) ("Respondent's registration was on the register, and thus presumably known to the Examiner of Trademarks, at the time when the Examiner of Trademarks was considering petitioner's right to registration.").

Decl., ¶104. BlendJet's Swirl Design was registered as a trademark for blenders on December 31, 2019. *See* Ex. 5.

In light of the crowded field of BLEND-formative and swirl design blender trademarks, it is clear that Blendtec's rights, to the extent they are valid, do not supersede MavorCo's rights to the use the federally registered BLENDJET trademark and Swirl Design.

## II.    A Long History of Delay and Tactical Litigation

After standing by while BlendJet and others secured federal trademark registrations in BLEND-formative marks and swirl designs, Blendtec then waited almost four years to initiate legal action, filing suit only in November 2021. During that time, BlendJet grew to become a dominant player in the portable blender market, with its BlendJet 2 product line ultimately selling more than 10 million units across 40,000+ retail locations. Pamplin Decl., ¶6. During this period of rapid expansion, Blendtec did not seek injunctive relief. Even after commencing litigation, Blendtec did not seek injunctive relief to stop BlendJet's continued operations. Instead, it engaged in protracted litigation, all while BlendJet expanded its product lines and built upon its distinct and well-known brand identity.

In early 2023, a recall affecting BlendJet 2 units was announced. *Id.*, ¶14. The recall was not, however, the result of any confirmed, widespread product hazard, as Blendtec suggests. Rather, the scope of the recall expanded largely due to packaging issues that made it difficult to isolate affected units, not because of any inherent defect. *Id*. Throughout this period, Blendtec still did not seek emergency injunctive relief. And despite complaining of the impact of the recall, two years later Blendtec fails to provide anything beyond unsupported speculation that it has been damaged by the recall.

III.    **Blendtec's Reactive Lawsuit and Injunction Motion**

At the close of 2024, Blendtec claims it believed BlendJet would exit the market. *See* Mot. at 7. Yet, in early 2025, BlendJet's assets—including its intellectual property, inventory, and customer data—were lawfully acquired by MavorCo Operations, LLC from a third-party secured lender, Sandton Capital Partners. This transaction was well-documented, and entirely lawful. Blendtec learned of this transaction no later than January 12, 2025, yet did not file this second lawsuit until February 11, 2025—almost a full month later. Indeed, Blendtec has made multiple inquiries about acquiring BlendJet, underscoring the commercial nature of its interest in the brand. Pamplin Decl., ¶17. Even after initiating the second suit, Blendtec waited an additional six weeks to move for a preliminary injunction—filing its motion on March 27, 2025. *See generally,* Mot. This delay occurred despite MavorCo's allegedly widely publicized Times Square campaign on February 10, 2025, which Blendtec cites as emblematic of urgency. Mot. at 6–7. If there was true irreparable harm, Blendtec's own conduct belies it.

Taken together, this pattern reveals that Blendtec is not acting to preserve trademark rights, but rather pursuing a years-long strategy of anti-competitive pressure and acquisition leverage.

IV.    **MavorCo's Sale of Existing Inventory**

MavorCo did not enter the blender market to trade on Blendtec's goodwill and has not in any manner sought to compete directly with Blendtec. Meckler Decl., ¶¶16-19, attached hereto as ***Exhibit C***.  MavorCo[3] acquired the BlendJet assets following a foreclosure and has paused any new manufacturing and scaled back on distribution and marketing. *Id.*, ¶13. The remaining inventory remains targeted at a consumer segment that does not overlap with Blendtec's market.

---

[3] Unless otherwise specified, "Mavorco" refers to Mavorco Operations, LLC. Mavorco Holdings, LLC and Mavorco IP, LLC have not conducted any activities relating to the challenged trademarks, and therefore there is no basis to enter an injunction against either entity. Meckler Decl., ¶10.

*Id.*, ¶¶13, 16. As shown below, BlendJet devices are portable, battery-powered, and priced between $50 and $70, serving everyday consumers:[4]



In contrast, Blendtec markets non-portable, high-end blenders priced from $400 to over $3,000, aimed at professional kitchens and specialty users:[5]



---

[4] https://blendjet.com/our-story; Pamplin Decl., ¶12.
[5] https://www.blendtec.com/; Pamplin Decl., ¶12.

 

**Coffee and Cream**
Need a pick-me-up? Homemade cold brew, frothed milk and whipped cream.

BLENDED COFFEE

**Grind Grains**
Perfect for grinding grains into bread, baked goods and specialty treats.

GRAINS TO FLOUR

**Mixed Drinks**
Get the perfect consistency for mixed drinks and pour-overs. Entertaining made easy!

PARTY DRINKS

Blendtec's incorrectly claims that MavorCo has somehow escalated the alleged infringement. The Times Square campaign cited by Plaintiff was a three-day free trial of a BlendJet ad on a single digital billboard. Meckler Decl., ¶15. It ran from February 7 through February 10, 2025. *Id*. It did not mention Blendtec, nor suggest any association or endorsement. And that advertisement has been down for over two months now. Similarly, Plaintiff points to "evidence of consumer confusion," yet most of that evidence is outdated and predates MavorCo's acquisition. There is no credible or admissible evidence that there has been any additional or escalating consumer confusion related to MavorCo's acquisition of the BlendJet assets.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (It is a "drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."). A preliminary injunction will be disfavored if it: (1) disturbs the status quo; (2) is

mandatory as opposed to prohibitory; or (3) affords the movant substantially all the relief he may recover following trial on the merits. *Primedia Intertec Corp. v. Tech. Mktg. Corp.*, 35 F. Supp. 2d 809, 814 (D. Kan. 1998). To prevail on a motion for preliminary injunction when the requested relief falls within one or more of these three categories, the movant must show that on balance, the four factors weigh heavily and compellingly in his favor. *Id.*

Blendtec seeks an injunction that will (1) disturb a long-standing status quo, (2) mandate the removal of product from sale as opposed to prohibiting planned activity, ***and*** (3) afford Blendtec the primary relief it will seek post-trial. Yet Blendtec fails to establish that any of the four factors weigh in its favor, much less that they do so "heavily" or "compellingly."

## I.    Blendtec's Years-Long Delay Belies Any Claim of Irreparable Harm and Precludes Injunctive Relief

Blendtec's failure to establish irreparable harm is fatal to its motion. A preliminary injunction is an "extraordinary remedy," and the movant must establish that they face irreparable harm. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Courts consistently hold that "a long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc). In trademark infringement cases, such delay in seeking relief "undercuts any presumption that infringement alone has caused irreparable harm pendente lite." *GTE Corp. v. Williams*, 731 F.2d 676, 678, 222 U.S.P.Q. 803 (10th Cir. 1984); *Sebo Am., LLC v. K&M Housewares & Appliances Inc.*, No. 1:20-cv-03683, 2021 U.S. Dist. LEXIS 71414, at *4 (D. Colo. Mar. 18, 2021) ("year-plus delay" before filing preliminary injunction motion precluded irreparable harm finding); *Harley's Hope Found. v. Harley's Dream*, Civil Action No. 22-cv-0136-WJM-STV, 2022 U.S. Dist. LEXIS 71750, at *7–8 (D. Colo. Apr. 19, 2022) (three year delay after becoming aware of Defendant's activities, and eight months delay after sending a cease-and-desist letter "rebuts any presumption" of

irreparable harm). Blendtec's conduct over the past six years demonstrates that this motion is neither urgent nor justified.

### A. Blendtec Delayed Nearly Three Years Before Filing the 2021 Action

BlendJet entered the market in early 2018 using the marks at issue. Blendtec claims it received consumer complaints at least as early as January 2020, including demands for refunds and confusion about product source. Mot. at 4; D.I. 26, ¶ 20. Yet, it did not bring suit until November 2021, over *three years* after BlendJet's launch and nearly two years after it first received notice of alleged confusion. This alone undermines any assertion that Blendtec has diligently enforced its rights or faces irreparable harm. *See Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 U.S. Dist. LEXIS 133506, at *8 (D. Utah July 26, 2022) (finding no irreparable harm after three months delay); *Nat'l Oilwell Varco, Ltd. P'ship v. Black Diamond Oilfield Rentals, LLC*, No. CIV-24-1258-D, 2025 U.S. Dist. LEXIS 65717, at *13-14 (W.D. Okla. Apr. 7, 2025) (same); *MID, Inc. v. Medic Alert Foundation United States, Inc.*, 241 F. Supp. 3d 788, 822–23 (S.D. Tex. 2017) (denying preliminary injunction after nine month delay); *Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 2006 WL 2092391 (D. Kan. 2006) (denying preliminary injunction after seven month delay);[6] *see also Logic Tech. Dev. LLC v. Levy*, No. 17-04630, 2021 U.S. Dist. LEXIS 165203, at *6 (D.N.J. Aug. 31, 2021) ("The Court is aware of no analogous case . . . where a litigant successfully established irreparable harm after a delay of more than three years.") (collecting cases).

---

[6] While these cases predate the 2020 amendments to § 1116(a), Courts have still found the analysis from earlier cases persuasive to determine "that the statutory presumption of irreparable harm has been rebutted based on the length of Plaintiff's delay." *Harley's Hope Found.*, 2022 U.S. Dist. LEXIS 71750, at *8 n.2.

### B.    Blendtec Delayed Again Before Seeking an Injunction in the 2025 Action

After nearly three additional years of litigation and negotiations with BlendJet, Blendtec still did not seek interim relief. Even the 2023 recall of BlendJet products—widely publicized and known to Blendtec—did not prompt a motion for injunction. Instead, Blendtec continued negotiating a potential acquisition of BlendJet in 2024, while BlendJet continued to operate and advertise under the same marks. Blendtec's delay during this time reflects not urgency, but strategy. Even after filing this suit, Blendtec waited until March 27, 2025—six additional weeks—to move for a preliminary injunction. This delay occurred despite Blendtec's claim that Mavorco's 3-day Times Square campaign that ended on February 10, 2025 created imminent harm. Mot. at 6–7. Courts routinely deny injunctive relief where, as here, the plaintiff delays seeking an injunction after the very events it claims constitute irreparable harm. *See nature's Life, Inc. v. Renew Life Formulas, Inc.*, 2006 WL 62829 (D. Utah 2006) (denying motion for preliminary injunction where plaintiff waited nine months after defendant issued revised logo); *see also Numen, LLC v. KC Float Spa, LLC*, No. 2:22-cv-02351-HLT, 2023 U.S. Dist. LEXIS 197916, at *11 (D. Kan. May 3, 2023) (denying an injunction where the "alleged harm ha[d] been present for almost a year"); *Jacobs v. Journal Publ'g Co.*, No. 1:21-cv-00690-MV-SCY, 2022 U.S. Dist. LEXIS 124625, at *7–8 (D.N.M. July 14, 2022) (finding that a 22-month delay "rebut[s] any presumption of irreparable harm"); *Logic Tech.*, 2021 U.S. Dist. LEXIS 165203, at *6 ("[M]any courts have found that a delay of just weeks or months precludes a showing of irreparable harm.").

In sum, Blendtec's motion should be denied. The significant and repeated delays in bringing suit—first against BlendJet, and now against MavorCo—are wholly inconsistent with the extraordinary relief Plaintiff seeks and entirely rebuts any presumption of irreparable harm.

## II.  Blendtec Cannot Establish a Likelihood of Success on the Merits

Even if Blendtec could establish irreparable harm—which it cannot—Blendtec must prove, with clear evidence, that it owns valid, protectable marks and that MavorCo's use of the Blendjet marks is likely to cause confusion. *See Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014). Blendtec can do neither.

### A.  Blendtec Is Unlikely to Establish That it Owns Valid, Protectable Marks

As a threshold matter, Plaintiff cannot prevail on its claims unless it demonstrates that the asserted marks are valid and protectable. But here, the marks at issue—BLENDTEC and the swirl design—are generic and functional, and therefore invalid. As the party asserting its trademarks, Blendtec bears the burden to prove validity and non-genericness, a burden it has not met. *See Moke Am. LLC v. Moke Int'l Ltd.*, 126 F.4th 263, 284 (4th Cir. 2025) (Party claiming ownership must "prove that the proposed mark is not actually a generic term lacking any distinctiveness at all.").

The term "Blendtec" is a compound of the word "blend"—a generic term for the function and output of a blender—and the suffix "-tec" or "-tech," a common shorthand for technology. *See Blend*, merriam-webster.com, https://www.merriam-webster.com/dictionary/blend (last visited Apr. 22, 2025) ("blend" means "something produced by blending"); *Tech*, merriam-webster.com, https://www.merriam-webster.com/dictionary/tech (last visited Apr. 22, 2025) ("tech" is often attributive to "technology"). As alleged in Defendants' counterclaims, this combination merely identifies what Blendtec sells: blender technology. A mark that is merely a combination of two generic components is not protectable. *See e.g., Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (holding that rational jury could not find that "beerman" portion of claimed "Bob the Beerman" trademark was descriptive as opposed to generic, and therefore that defendant's use of "beerman" portion was not infringement); *Braun Inc. v. Dynamics Corp. of*

*Am.*, 975 F.2d 815, 827 n.25 (Fed. Cir. 1992) ("[T]he functional qualities of the blenders—to puree fruits and vegetables and blend drinks. . . . as a matter of law [are] generic and descriptive.").

The swirl design mark fares no better. The design (U.S. Reg. No. 4050765), pictured immediately below is not arbitrary or source-indicating:



The same or similar design appears on a button for multiple of Blendtec's competitors, including but not limited to BlendJet and babybreeza. *See* Counterclaims (Dkt. 44) at ¶ 19. The design consists of a circular motif that is commonly used in the appliance and electronics industries, and more specifically for blenders, to denote on/off, power, motion, or activation—which are all functional associations. The Lanham Act does not protect design features that are functional, even if they also serve an aesthetic role. *See* 15 U.S.C. § 1125(a)(3). It is well-established that "'a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 32, (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). The swirl design here undeniably conveys the motion of a blender and directs users toward the functionality of the button—that literally turns the blend function on and off.

In short, the BLENDTEC mark is generic, and the swirl design is functional. Plaintiff's failure to establish valid, protectable rights precludes any finding of likelihood of success on the merits, regardless of the confusion analysis that follows.

### B. Confusion is Unlikely Given the Commercial Context and the Limited Scope of Blendtec's Alleged Trademark Rights

Courts evaluate the likelihood of confusion by weighing six factors: (1) the strength or weakness of the plaintiff's mark; (2) the degree of similarity between the marks; (3) similarity of products and manner of marketing; (4) the degree of care likely to be exercised by purchasers; (5) the intent of the alleged infringer in adopting its mark; and (6) evidence of actual confusion. *See Hornady*, 746 F.3d at 1001; *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1245 (D. Utah 2020). Under this test, "no one factor is dispositive [and] [a]t all times the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Water Pik, Inc. v. Med-Systems, Inc.*, 746 F.3d 995, 1143 (10th Cir. 2013). Furthermore, "[t]he importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor." *Id.* Each factor weighs against a finding of likely confusion.

#### 1. Blendtec's Marks Are Weak

Under Tenth Circuit law, courts assessing the strength of a mark consider both its conceptual strength—where it falls on the spectrum from generic to arbitrary—and its commercial strength—the degree to which the mark is recognized in the marketplace. *See Water Pik*, 726 F.3d at 1150. On both fronts, the Blendtec Marks are weak. Blendtec's BLENDTEC mark and swirl design are at best, weak and entitled to only a narrow scope of protection that does not extend to bar Mavorco's use of its own registered trademarks.

##### i. Conceptual Weakness: The Blendtec Marks Are At Best Descriptive

The conceptual strength of a mark reflects how inherently distinctive it is. *Id.* A mark may be (from weakest to strongest): generic, descriptive, suggestive, arbitrary, or fanciful. BLENDTEC

falls toward the lower end of this spectrum.[7] The prefix "blend" directly describes the function of the product—*i.e.*, a blender—and the suffix "-tec" is a common generic indicator of technology-related goods. *See supra* Section II.A. Together, "Blendtec" simply describes blending technology. *See id.* Therefore, BLENDTEC is a generic mark that is not entitled to trademark protection.

At most, BLENDTEC is a descriptive mark, which courts routinely hold are conceptually weak and entitled only to limited protection. *See Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002) (holding that even suggestive marks may be "commercially weak" and thus entitled to a narrow scope of protection). For example, in *Water Pik*, the Tenth Circuit affirmed the district court's finding that the mark "Sinu*Cleanse*" was conceptually weak because it combined a commonly used prefix ("sinu"), which was "essentially generic" when referring to a product for sinuses, with a descriptive word ("cleanse") that directly conveyed the product's purpose. *Water Pik*, 726 F.3d at 1150 ("[I]t is plainly a composite of the common words "sinus" and "cleanse," which, when fused together, straightforwardly communicate the nature and purpose of Med-Systems' products: they cleanse the sinuses.").

Blendtec's swirl design fares no better. The same swirl-type logos are ubiquitous in the appliance and tech industries, often used to suggest speed, motion, or energy—all generic themes for a blender. *See supra* Section II.A. Where design elements are commonly used in the industry or lack distinctiveness, they cannot carry much weight in the likelihood of confusion analysis. Where, as here, the marks are weak "[t]he differences between [BLENDTEC] and [BlendJet's] mark[s] therefore make confusion highly unlikely." *Water Pik*, 726 F.3d at 1151–1152.

---

[7] Blendtec argues their marks have gained incontestable status. However, "[T]he Tenth Circuit has noted that the fact that a trademark is the subject of a federal registration that has ripened into incontestable status should not dictate the conclusion that the mark is strong with no further analysis." *Overstock.com, Inc. v. Nomorerack.com, Inc.*, No. 2:13-CV-1095, 2014 U.S. Dist. LEXIS 89620, at *20 (D. Utah June 30, 2014).

### ii. Commercial Weakness: The Blendtec Marks Lack Distinctiveness in the Marketplace

A mark may also be commercially weak where many others use similar marks in the same industry, or where the mark lacks substantial recognition among consumers. In *Water Pik*, the court found the plaintiff's mark to be commercially weak due to "extensive third-party use of similar marks in the same market," which "dilute[d] the strength of the mark." *Id.* at 1151. The court cited a crowded market of sinus-related brands that used similar prefixes or suffixes, including "SinuSense," "SinuClear," and others. Similarly, in *First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645 (10th Cir. 1996) the court found that "[s]pecifically, third-party registrations are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak" and "[w]hen the primary term is weakly protected to begin with, minor alterations may effectively negate any confusing similarity between the two marks." *Id.* at 654-55.

Here, the record shows extensive third-party use of the word "blend" in connection with blending products. Numerous other blender and kitchen appliance brands incorporate the word "blend" or its derivatives in their trademarks. *See* Exs., 6–82; *see also* D.I. 44 at 16–28. The widespread use of "blend" in this space confirms that consumers perceive it as a generic or descriptive term, not as a source identifier unique to Blendtec.

This common usage "diminishes the significance of the similarities" and erodes Plaintiff's claim to any exclusive rights in the mark. *Water Pik*, 726 F.3d at 1151–1152*; see also First Sav. Bank*, 101 F.3d at 653–54 ("[A] weak trademark is one that is often used by other parties. The greater the number of identical or more or less similar marks already in use on different kinds of goods, the less is the likelihood of confusion."). Moreover, Blendtec does not enjoy top-of-mind

awareness among consumers, Pamplin Decl., ¶19, and Blendtec has failed to put forward any evidence that consumers recognize its branding.

In sum, Plaintiff's marks are weak—both in conceptual strength and commercial distinctiveness—and operate in a crowded field of similar names and graphics.

### 2.    The Marks Convey Distinct Commercial Impressions

Blendtec concedes that the Blendtec Marks and BlendJet Marks have different second syllables, different font, and appear in different colors. Mot. at 9. Yet Blendtec nonetheless argues these differences should be discounted and the marks should instead be "evaluated when singly presented rather than side-by-side." Mot. at 16. But that argument is belied by Plaintiff's own expert, who utilizes a "Squirt" survey based on his *ipse dixit* conclusion that consumers encounter these brands "in digital and/or temporal proximity." Franklyn Report (D.I. 28-1) at 5.

Stripping away Blendtec's strained comparisons, such as its frivolous suggestion that "tec" and "jet" differ visually only to the extent that one contains a "j" and the other contains a "c," Mot. at 14, Blendtec's argument that these independently registered marks are confusingly similar boils down to their use of the word "blend." But that commonality is insufficient to support a finding of likely confusion. Indeed, the Tenth Circuit has emphasized that courts must consider the marks in their entirety and in context—not just individual components. *See Water Pik*, 726 F.3d at 1156 ("[W]e do not independently examine each syllable of the marks but consider the marks as a whole as they are encountered by consumers in the marketplace.") (finding Sinu*Cleanse* and SinuSense were not similar); *Hornady*, 746 F.3d at 1002 ([T]he court is not free to give dispositive weight to any one component of the marks, such as a shared syllable.") (finding TAP and DoubleTap were not similar); *Overstock.com*, 2014 U.S. Dist. LEXIS 89620, at *5 (finding 'overstock' and 'overstock.com' were not similar). Moreover, courts have noted that descriptive shared components of a mark, such as "blend," "may be given little weight in reaching a conclusion on

likelihood of confusion." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 947 (Fed. Cir. 2000). In a crowded field of lookalike marks that incorporate generic or descriptive elements, the differences carry greater weight. *See United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 562 (2020) ("When a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner.").

In *Water Pik*, the court emphasized that "Sinu*Cleanse*" and "Sinusense" projected different messages—one evoking clinical sanitation, the other intuitive wellness—and thus conveyed different impressions to consumers. *Water Pik*, 2012 WL 5880682, at *14–15. Here, too, the connotation and branding of "BlendJet" are distinct and targeted at a different consumer mindset: "Blendtec" touts a technology-forward product, while "BlendJet" fancifully implies speed or portability. These distinctions are amplified by the parties' distinct branding, logos, and color schemes. Thus, this factor weighs against a finding of confusion.

### 3. The Parties Offer Distinct Products to Distinct Purchasers

As conceded by Plaintiff, the products differ greatly in target customer, and pricing. Plaintiff sells high-end countertop blenders, often used in professional or serious home settings, typically priced from $400 and $3000. Mot. at 18; *see supra* note 7; Pamplin Decl., ¶12. In contrast, Defendants offer low-cost portable blenders, sold for around $50, marketed toward casual users and impulse buyers. Pamplin Decl., ¶12; *see Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 428 (E.D. Pa. 2012) ("If the difference in price between two products is large enough that they are purchased by two entirely different classes of people, confusion is less likely.").

### 4. Blendtec's Consumers Exercise High Degree of Care

Consumers of Blendtec's high-priced appliances are not impulse buyers. They research brands, read reviews, and carefully consider performance before spending hundreds or thousands of dollars on a kitchen appliance. This level of purchasing care weighs heavily against confusion.

*See Hornady*, 746 F.3d at 1005 (consumers are less likely to be confused when purchasing expensive or specialized products). Even BlendJet customers, though buying a more affordable item, are guided by highly targeted branding and packaging. In *Water Pik*, the court found that even a modestly priced consumer health product was subject to consumer scrutiny where branding, packaging, and retail settings helped differentiate the products. *Water Pik*, 2012 WL 5880682, at *17–18. The same is true here, where no reasonable consumer would confuse a battery-powered portable $50 blender for a high-end $400+ professional grade fixed appliance.

### 5. MavorCo's Intent Does Not Support Likelihood of Confusion

BlendJet has been operating under its own name since well before Mavorco's acquisition and has built enormous brand equity, selling over 10 million units globally and operating in more than 40,000 retail locations. Pamplin Decl., ¶¶5-6. There is no evidence that BlendJet—or Mavorco—adopted the name to trade off of Blendtec's goodwill or to confuse consumers. To the contrary, the BLENDJET word mark and associated swirl design were lawfully registered on the Principal Register by BlendJet in 2019 (Reg. No. 5,750,510 and Reg. No. 5,950,040)—years before Blendtec filed suit in November 2021 and long before MavorCo ever existed. Pamplin Decl., ¶¶8-10. These registrations reflect BlendJet's original, good-faith adoption of its brand and create a presumption, which BlendJet has not rebutted, that the BlendJet trademarks are not confusingly similar to the Blendtec marks. 5 McCarthy on Trademarks and Unfair Competition § 32:136 (5th ed.) (explaining that the presumption that a registrant has an exclusive right to use a registered mark means that it is *prima facie* evidence that a mark is not confusingly similar to other registered marks). MavorCo, as the purchaser of those assets through a commercially legitimate foreclosure sale, is entitled to rely on the validity of those registrations and the public notice they provide regarding BlendJet's nationwide rights in the marks.

Blendtec now argues that MavorCo adopted the marks with intent to infringe, but the record contradicts that narrative. When MavorCo acquired the marks, it did so with knowledge not only of their longstanding USPTO registration, but also of the fact that Blendtec had sat on its claims for over three years in a slow-moving litigation against BlendJet that had not proceeded beyond the early stages. Meckler Decl., ¶¶17-18. During that time, BlendJet continued to operate openly in the marketplace using the same marks. MavorCo reasonably viewed Blendtec's passive litigation posture and years of coexistence with BlendJet as indications that Blendtec either doubted the strength of its claims or did not consider them especially urgent. *Id.*, ¶18.

Moreover, while Blendtec emphasizes that it sent a letter to Sandton on January 9, 2025, asserting its trademark claims, that letter arrived just days before the foreclosure closed on January 13, and no temporary restraining order or injunction was sought before the transfer occurred. The idea that a single, pre-closing letter—sent years after BlendJet's registration of its marks and years into an unresolved lawsuit—somehow taints MavorCo's acquisition ignores both the commercial realities and the due process protections afforded to registered mark holders.

In sum, all available facts indicate that MavorCo relied in good faith on BlendJet's ownership of valid federal trademark registrations, and the belief that its use of lawfully acquired marks was consistent with both trademark law and commercial practice.

### 6.    Alleged Actual Confusion Evidence Is Insufficient

Finally, BlendJet's evidence of actual confusion, even taken at face value, is de minimis in light of the parties' long coexistence and the tens of millions of units sold. *Water Pik*, 726 F.3d at 1150–51 ("[I]solated, anecdotal instances of actual confusion may be de minimis and may be disregarded in the confusion analysis."); *Overstock.com*, 2014 U.S. Dist. LEXIS 89620, at *14 ("Both parties tout that they have millions of customers and make millions of sales per year. Thus, relative to the total volume of sales, the limited evidence of actual confusion provides little

weight."); *GOLO, LLC v. Goli Nutrition Inc.*, 2020 WL 5203601, *9 (D. Del. 2020) ("210 confusion events, in the context of having 500,000 customers, would equate to 0.042 percent of Plaintiff's customers, a *de minimis* showing of confusion."); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, 2006 WL 892718, at **9-10 (D.N.J. Apr. 4, 2006) ("Given that EMSL works on approximately 233,000 projects each year, let alone the number of customer inquiries that both parties receive annually, fifteen-twenty instances of confusion does seem de minimis.").

Even taking Blendtec's evidence of alleged confusion at face value, much of it actually supports the conclusion that consumers recognize BlendJet and Blendtec as distinct brands, rather than being confused into believing they originate from the same source. For example, Blendtec highlights customer comments noting that "there's a portable blender company using a logo that looks very much like yours with a similar name," or that "there's a company from China kind of looks like they are ripping off on your name and your trademark. They are calling themselves BlendJet." Mot. at 16. These remarks do not reflect actual confusion about source—they reflect recognition of similarity between separate entities, with consumers perceiving that one company resembles the other, not that they are the same. *See Overstock.com*, 2014 U.S. Dist. LEXIS 89620, at *15–16 ("[T]here is also evidence from among those cited to the Court where consumers clearly recognized the distinction between Plaintiff and Defendant . . . Thus, not all of Plaintiff's evidence of actual confusion actually shows any confusion on the part of the consumer."). At best, such statements commenting on similarities, and questioning the resemblance, reflect a heightened awareness of branding in the marketplace, not a belief that one company is responsible for the other's product.

Blendtec's reliance on a survey conducted by Professor David Franklyn in July 2023 as circumstantial evidence of actual confusion is similarly unavailing. "[A] survey to test likelihood

of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Simon Property Group, L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1038 (S.D. Ind. 2000); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010 WL 5186393 at *6 (D. Utah Dec. 15, 2010). Professor Franklyn's survey fails to replicate the thought processes of consumers encountering the disputed marks in at least three fatal ways.

First, Professor Franklyn's survey fails to replicate the real-world conditions under which consumers encounter the parties' products. Rather than show survey takers the blenders as they appear in the marketplace, with distinct packaging and in close proximity to pricing information, Professor Franklyn strips the blenders of this critical context and instead showed half of his respondents "images of blenders isolated against white backgrounds." D.I. 28-1 at 6. Isolating the blenders in this way violates a basic tenet of trademark law, namely that marks should be compared "as a whole as they are encountered by consumers in the marketplace." *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1090 (10th Cir.1999). By presenting the mark "differently from the way that it actually appears on packaging," Professor Franklyn's survey "exaggerated the similarities between the two marks, likely increasing the confusion of the respondents." *Water Pik*, 726 F.3d at 1146. Indeed, where Professor Franklyn did include pricing information, the confusion rate was nearly cut in half. D.I. 28-1 at 25 (26.9% vs. 14% confusion).

Moreover, despite displaying pricing and a portion of the online webpage to half of his survey takers, Professor Franklyn's survey further distorts commercial reality by presenting a *Squirt*-style, side-by-side comparison of blenders. D.I. 28-1 at 91. As the Tenth Circuit has warned, "a side-by-side comparison is not the proper method of determining likelihood of confusion. The marks 'must be compared in light of what occurs in the marketplace, not in the courtroom." *Water Pik*, 726 F.3d at 1147. Like the expert in *Water Pik,* Professor Franklyn "point[s] to screenshots

of search results from online shopping websites, where both [Blendtec] products and [BlendJet] products are featured," but "these screenshots do not support [his] contention that a side-by-side comparison was the proper survey design." *Id.* Indeed, in none of the screenshots are the Blendtec products and BlendJet products "isolated and displayed next to one another; rather, they are scattered among a host of other" blender products that have "blend" in the name. *Id.* This inflationary effect of this survey design is apparent, as many of the survey respondents that Professor Franklyn considers to be confused relied solely on the presence of "blend" in both products' name. *See* D.I. 28-1 at 27-31 (counting as confused, respondents that were allegedly confused simply because "both have 'blend' in the name"). Under such circumstances, courts routinely "distrust the survey's side-by-side format." *Water Pik*, 726 F.3d at 1147.

Second, Franklyn's survey draws from an improper universe of respondents, further inflating his confusion results. Here, Professor Franklyn purports to include potential buyers of both Blendtec and BlendJet products. D.I. 28-1 at 18. Specifically, he included respondents that had purchased or planned to purchase a blender in the last or next 12 months and used quotas to ensure that approximately 70% of the respondents were past and/or future purchasers of portable blenders. *Id.* But as discussed above, the Blendtec and BlendJet products are directed to distinct customer bases and are listed at entirely different price points. *See supra* Section II.B.3. By failing to screen participants based on the price point of blender they would consider purchasing, Professor Franklyn fails to account for any level of care exercised by consumers. Professor Franklyn further obfuscates his confusion results by presented them as an aggregated figure, without isolating the confusion among the distinct customer pools. This violates fundamental principles of survey design, which require the survey population to mirror the population of likely purchasers. *1-800 Contacts*, 2010 WL 5186393, at *7 ("Even if the subset's size is sufficient, no

data was presented in Degen's report to show how these particular respondents answered the questions presented on the screen shots."). Here, the failure to account for price considerations inflates the likelihood of confusion.

Third, the control stimulus used—"Pomo"—is also fundamentally flawed. It bears no resemblance to either "BlendJet" or "Blendtec," and more importantly, excludes the word "blend," which is the only shared component between the marks at issue. As the Tenth Circuit recognized in *Water Pik*, a control must be designed to isolate the variable being tested. 726 F.3d at 1148 ("To isolate confusion arising specifically from the contested mark, survey designers will substitute for the contested mark a control mark that shares as many characteristics with the contested mark as possible, with the key exception of the characteristic whose influence is being assessed."). By omitting "blend" from the control, Franklyn inflates the net confusion rate, falsely attributing confusion to brand similarity rather than to the generic use of a common root word.

These methodological flaws—failure to replicate market conditions, inclusion of an unrepresentative universe, and use of an improper control—strip the survey any weight under the Tenth Circuit's likelihood of confusion factors.

## III.     The Balance of the Equities Favor MavorCo

The Court need not review the third and fourth factors when Blendtec cannot establish either a likelihood of success on the merits or irreparable harm. *See Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1236 (10th Cir. 2019). If it does, however, the Court should find that the balance of the equities weighs against granting an injunction. Contrary to Blendtec's claims, an injunction restraining MavorCo from using the "BlendJet" mark and swirl design would devastate MavorCo's business, disrupting its operations, jeopardizing jobs, and invalidating a multi-million-dollar asset purchase. In contrast, as Blendtec's dilatory conduct establishes, denying the preliminary injunction would not irreparably harm Blendtec. Instead, it would

preserve the status quo, which Blendtec has been content to preserve for the better part of seven years. On this record, the balance of equities mandates denial of the preliminary injunction. *See Route App*, 2022 WL 2953917, at *4 (Plaintiff's loss of "approximately forty customers out of thousands [did] not outweigh the harm of preventing Defendants from marketing and selling Navidium, which would potentially shut it down"); *see also Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, 2016 WL 4770244, at *9 (D. Del. 2016) (denying preliminary injunction where issuance of preliminary injunction would significantly impair defendant's business, while denial would preserve status quo).

## IV.    Public Interest Disfavors an Injunction

Public interest also weighs against granting an injunction. The public's strong interest in lawful competition and competitive pricing is well-established. *See, e.g.*, *Route App*, 2022 WL 2953917, at *4 ("[I]t is not in the public interest to issue injunctive relief where doing so would interfere with a competitive marketplace."); *see also Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500 (8th Cir. 1987) (reversing preliminary injunction where court did not account for the "strong public interest in lowest possible prices"). MavorCo's acquisition of the Blendjet brand and its efforts to continue offering affordable, portable blenders to consumers are consistent with fair market practices and promote the proper functioning of the lending market.

Enjoining MavorCo's efforts based on a dubious claim of exclusivity in "blend" would harm consumers and competitors alike. *See Close to my Heart, Inc. v. Enthusiast Media LLC*, 508 F. Supp. 2d 963, 972 (D. Utah 2007) (noting the public "interest in free competition in the marketplace, as well as an interest in freedom from meritless litigation that ultimately results in higher costs to consumers). It would also grant Blendtec a monopoly on the term "blend," which the Supreme Court has expressly warned against. *Booking.com*, 591 U.S. at 562. In sum, the public interest weighs against granting Blendtec a preliminary injunction on this record.

## CONCLUSION

For the reasons above, MavorCo respectfully requests that the Court deny the Motion.


Dated: April 25, 2025

Respectfully submitted,

*/s/ Lucy Jewett Wheatley*

George B. Hofmann, IV (10005)
Kathryn Tunacik (13363)
**COHNE KINGHORN, P.C.**
111 E Broadway 11th Fl
Salt Lake City, UT 84111
Tel: (801) 363-4300
Fax: (801) 363-4378
Ghofmann@cohnekinghorn.Com
Ktunacik@ck.Law

Lucy Jewett Wheatley (*Pro Hac Vice*)
**MCGUIREWOODS LLP**
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-4320
Fax: (804) 698-2130
Email: lwheatley@mcguirewoods.com

Kyle S. Smith (*Pro Hac Vice*)
**MCGUIREWOODS LLP**
501 Fayetteville St., Ste. 500
Raleigh, NC 27601
Tel: 919-835-5966
Fax: 919-755-6607
Email: ksmith@mcguirewoods.com

Jessica S. Maupin (*Pro Hac Vice*)
**MCGUIREWOODS LLP**
2601 Olive Street, Suite 2100
Dallas, TX 75201
Tel: (214) 932.6400
Fax:  (214) 932.6499
Email: jmaupin@mcguirewoods.com

***Attorneys for Defendants***
***MavorCo Holdings, LLC; MavorCo IP, LLC; and***
***MavorCo Operations, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send an electronic notification to counsel of record for all parties, including the following:

Brett Foster (#6089)
Mark Miller (#9563)
Tamara Kapaloski (#13471)
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
foster.brett@dorsey.com
miller.mark@dorsey.com
kapaloski.tammy@dorsey.com

*Attorneys for Plaintiff Blendtec Inc.*

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Jessica S. Maupin, certify that this MavorCo's Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction contains 7,745 words and complies with DUCivR 7-1(a)(4).

*/s/ Jessica S. Maupin*
Jessica S. Maupin